RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0131P (6th Cir.)
File Name: 01a0131p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
          *Plaintiff-Appellant/*
          *Cross-Appellee,*

          *v.*

JACKSON C. O'DELL, III,
          *Defendant-Appellee/*
          *Cross-Appellant.*

Nos. 99-5759/
6153/6155

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 94-00164—R. Leon Jordan, District Judge.

Argued: October 27, 2000

Decided and Filed: April 24, 2001

Before: DAUGHTREY and CLAY, Circuit Judges;
COHN, District Judge.[*]

_____

[*]The Honorable Avern Cohn, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

---

**COUNSEL**

**ARGUED:** Steve H. Cook, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellant. David S. Wigler, Knoxville, Tennessee, for Appellee.   **ON BRIEF:** Steve H. Cook, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellant. David S. Wigler, Herbert S. Moncier, Knoxville, Tennessee, for Appellee.

---

**OPINION**

---

CLAY, Circuit Judge.  This is a consolidated appeal in which the government appeals from two separate judgments entered by the United States District Court for the Eastern District of Tennessee in favor of Defendant Jackson C. O'Dell III ("Defendant") reducing his sentence and declining to order the forfeiture of certain property.  In addition, Defendant cross-appeals on speedy trial grounds his conviction on charges stemming from his involvement in a marijuana growing and distribution operation.

Specifically, in **Case No. 99-6155**, Defendant cross-appeals from the district court's denial of his motion to dismiss the indictment for violation of the speedy trial provision of the Sixth Amendment.  The district court determined that Defendant failed to satisfy the four-factor balancing test of *Barker v. Wingo*, 407 U.S. 514 (1972), and was, therefore, not entitled to relief.  In **Case No. 99-6153**, the United States appeals from the district court's judgment sentencing Defendant to eighteen months imprisonment upon application of the "safety valve" provisions of 18 U.S.C. § 3553(f) and under the range established by United States Sentencing Commission, *Guidelines Manual* § 5C1.2. The district court determined that Defendant established his eligibility for a reduced sentence under the safety valve and then found a

it only applies to the post-forfeiture context. Inasmuch as no forfeiture order was ever entered, the requirements of that provision could not be triggered. Moreover, we note that if the government were truly concerned about gathering evidence regarding proof of ownership, it could have at the very least requested a recess for purposes of discovery and investigation. But the record reflects no such attempt by the government.

### CONCLUSION

With respect to Defendant's cross-appeal in **Case No. 99-6155**, we believe that under the four-factors first established in *Barker v. Wingo* Defendant has failed to show that his Sixth Amendment right to a speedy trial was violated. We, therefore, **AFFIRM** the district court's denial of the motion to dismiss the indictment on Sixth Amendment speedy trial grounds. With respect to the government's appeal in **Case No. 99-6153**, we hold that the district court's finding that Defendant successfully established his eligibility for the protection of the "safety valve" of 18 U.S.C. § 3553(f) and USSG § 5C1.2 was clearly erroneous. Thus, we **VACATE** the judgment of sentence entered by district court and **REMAND** for re-sentencing without application of the safety valve. Finally, in **Case No. 99-5759**, we find that Defendant's interest in the 171-acre farm property was extinguished and no longer exists. Therefore, we hold that the district court's refusal to order forfeiture of that interest does not amount to reversible error and we **AFFIRM** the district court's order denying forfeiture.

sentencing range of eighteen to twenty-four months imprisonment, ultimately sentencing Defendant to eighteen months. In **Case No. 99-5759**, the government also appeals from the district court's failure to order the forfeiture of certain farm property pursuant to 21 U.S.C. § 853. The district court determined that forfeiture was inappropriate because Defendant was not the true owner of the property.

On motion of the government, all three appeals were consolidated for argument and submission. We now **AFFIRM** the district court's order denying the motion to dismiss on speedy trial grounds as well as the district court's refusal to order forfeiture of the farm property. But we **VACATE** the district court's judgment sentencing Defendant to eighteen months imprisonment and **REMAND** for re-sentencing without application of the safety valve provisions.

### BACKGROUND

Prior to August 1991, an investigation was conducted by federal authorities regarding Defendant's involvement in drug trafficking. During the investigation, law enforcement officials received information from a citizen-informant that Defendant was involved in marijuana and cocaine distribution and further that he had been a pilot smuggling drugs for an organized crime operation. In corroboration of this information, two federal agents observed Defendant and his two sons enter a barn on some farm property (later identified as the 171-acre farm property). They worked for an extended period of time, coming out periodically to cool off. During the investigation, one of the agents used a thermal imaging device to detect heat emanating from the barn structure. In addition, utility bills for the barn reflected a significant electricity usage. Upon obtaining and compiling this and other information, agents filed affidavits in support of search warrants, which they successfully obtained.

On August 15, 1991, law enforcement officers executed two federal search warrants in Monroe County, Tennessee, at the property owned or controlled by Defendant. The first warrant authorized the search of a 243.7-acre lot of farm

property in the Tellico Plains area of Monroe County, Tennessee; the second warrant authorized the search of Defendant's home at 266 Tonawanda Trail in Madisonville, Monroe County, Tennessee. The agents discovered what they later described as the most sophisticated marijuana growing operation they had ever seen. Over two hundred marijuana plants in various stages of growth were being cultivated in three separate rooms of the barn. Business records recovered by agents showed that between 1987 and 1989, Defendant received thirteen shipments of marijuana growing equipment valued at approximately $3,000. An agent testified that the marijuana possessed by Defendant would have had a wholesale value of $406,000.

At Defendant's home at 266 Tonawanda Trail, officers discovered numerous items linking Defendant to participation in the cultivation and growing of marijuana and to the barn where the marijuana operation had been discovered. These included several magazines and pamphlets regarding marijuana use and production as well as brochures for marijuana seeds and growing equipment.

On the same day the search warrants were executed, the government filed civil forfeiture actions against Defendant's residence and against the 243.7-acre farm property and the improvements thereon. These cases were assigned the numbers 3:91-cv-487 and 3:91-cv-488, respectively. When the civil forfeiture action against the 243.7-acre farm property was filed, the property deed on file reflected that the barn on the farm property (in which the marijuana-growing operation was discovered) was in the name of Defendant's father, Jackson C. O'Dell, Jr. O'Dell, Jr. stated at the time that the barn belonged to Defendant, his son. The government later learned that the barn and 171 acres of the farm property had been the subject of a 1977 Escrow Agreement and Warranty Deed between father and son. Thereafter, a third civil forfeiture action was commenced against the barn and the 171 acres. This case was assigned number 3:92-cv-275. On May 15, 1992, Defendant filed a verified claim asserting that he was, in part, "entitled to ownership in the seized property as

permitted under 21 U.S.C. 853(m).[14] As a threshold matter, the government failed to preserve these issues for appeal inasmuch as they were not argued in the district court. The government fails to cite anywhere in the record where it objected to the district court's procedure. *See Advocacy Organization for Patients and Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 325 (6th Cir. 1999) (failure to raise an argument before the district court constitutes waiver on appeal). Moreover, we find both of these claims meritless. First, we recognize that Defendant's ownership of the farm property was directly at issue from the start of the criminal proceedings because it was a necessary element for conviction on Count Three of the indictment.[15] Thus, the government was on notice that it needed to prove such ownership. Regardless of Defendant's former claims to ownership of the property or the perceived simplicity of the proposition, the government erred by resting on its laurels and assuming that this element had been satisfied. Indeed, the government's failure to prove that Defendant owned the farm property may have led to Defendant's acquittal on Count Three of the indictment. In addition, the discovery authorized by subsection 853(m) is inapplicable in the instant case because

---

[14]Subsection (m) provides:

In order to facilitate the identification and location of property declared forfeited and to facilitate the disposition of petitions for remission or mitigation of forfeiture, after the entry of an order declaring property forfeited to the United States, the court may, upon application of the United States, order that the testimony of any witness relating to the property forfeited be taken by deposition and that any designated book, paper, document, record, recording, or other material not privileged be produced at the same time and place, in the same manner as provided for the taking of depositions under Rule 15 of the Federal Rules of Criminal Procedure.

[15]Count Three of the indictment alleged that Defendant "did knowingly and intentionally make available for use a building and enclosure which he managed and controlled as owner for the purpose of unlawfully manufacturing and storing marijuana . . . ." (Indictment, J.A. at 56.)

interests in subject property, is not implicated in this case because no forfeiture order was ever entered. Moreover, it is Defendant who is challenging the forfeiture and not O'Dell, Jr. In this respect, no third party is involved here. The district court's recognition that O'Dell, Jr. was the owner is not analogous to a third-party hearing. We also note that the recall of the deed by O'Dell, Jr. is distinguishable from a circumvention of forfeiture rules through transfer of interests, which the relation-back provision of 21 U.S.C. § 853(c) was designed to prevent. Under that provision, property that is subsequently transferred to a third party is nonetheless subject to forfeiture unless the transferee is an "innocent owner" or a *bona fide* purchaser within the meaning of the statute.[13] But in the instant case Defendant's interest was not transferred to his father; rather, we find that Defendant's interest was actually extinguished when his father re-acquired the Warranty Deed.

### 3. Alleged procedural errors

The government also alleges that the district court committed certain procedural errors. First the government claims that it had no notice that ownership of the property would be an issue until just before the trial. The government also argues that it was not given an opportunity to conduct discovery on the challenge to Defendant's ownership as

---

[13]Subsection (c) of § 853 states:

All right, title, and interest in property described in subsection (a) of this section vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (n) of this section that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

---

the owner of said property." The earlier forfeiture action against the entire 243.7 acres (3:91-cv-488) was then dismissed.

As the civil forfeiture actions commenced, Defendant disputed the underlying criminal charges against him for marijuana possession and intent to distribute. Numerous delays were occasioned by changes in Defendant's plea agreement. Fourteen months of plea negotiations ended with Defendant entering a guilty plea on November 8, 1993 to an information charging him with manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1). Over the next ten months, the parties negotiated the terms of the plea agreement, which were dependant upon the guilty pleas of Defendant's father and sons on related charges.

### FACTS

#### A. Case No. 99-6155 (Sixth Amendment Speedy Trial Claim)

This case has an extensive procedural history dating back nearly a decade and involving civil forfeiture actions, criminal prosecutions and multiple appeals to and reversals by this Court. Approximately one year after the case was referred to the United States Attorney's Office, it was assigned to Assistant United States Attorney ("AUSA") Stephen H. Cook. Due to the lengthy mandatory minimum sentences Defendant faced, AUSA Cook and defense counsel engaged in extensive plea negotiations. After several months Defendant agreed to plead guilty to violation of 21 U.S.C. § 846, later changed to a guilty plea to 21 U.S.C. § 841(a)(1). The plea agreement also called for Defendant's father and sons to plead guilty to state charges regarding their involvement in the offenses. A letter confirming the proposed plea agreement was sent to all parties, making clear that the government's acceptance of the plea agreement was conditioned on the pleas of Defendant's father and sons. Defendant and his father and sons were concerned that the plea agreement could prevent the father and sons from obtaining a judicial diversion from the state court. Thus, AUSA Cook added a clause to the plea

agreement indicating that "nothing in this clause of the plea agreement is intended to prevent the defendant's father or the defendant's sons from applying for or obtaining judicial diversion and their obtaining such diversion will not affect this plea agreement." Subsequently, plea negotiations between the district attorney and Defendant's father and sons broke down. Once it was clear that Defendant's father and sons would not plead guilty to state charges, AUSA Cook filed a Notice of Failure to Comply with Plea Agreement. Though the government reported this breach to the district court and indicated that it was no longer bound to honor the plea agreement, it did not actually seek to withdraw from that agreement. Rather, the notice merely gave Defendant the opportunity to withdraw his guilty plea. Defendant then filed a Motion to Enforce the Plea Agreement. But the district court acknowledged that the failure of Defendant's father and sons to plead guilty to state charges constituted a breach and declined to enforce what it deemed to be an "unenforceable" plea agreement.

On June 14, 1994, Defendant filed a Motion to Reconsider This Court's Memorandum and Order Dated June 1, 1994, or in the Alternative, Notice of Withdrawal of Plea (J.A. at 332.) In that pleading Defendant stated that his withdrawal of the plea would not be a "voluntary act." The government responded and urged the district court to proceed to sentencing. But on August 11, 1994, the district court entered a memorandum and order withdrawing Defendant's guilty plea and set a trial date of October 20, 1994. At this point, the two civil forfeiture actions were pending and Defendant was charged in the one-count information.

Meanwhile, a significant decision in a forfeiture case was issued by one of our sister circuits. The Ninth Circuit Court of Appeals held that a civil forfeiture action was barred by the Double Jeopardy Clause of the Fifth Amendment because it constituted multiple punishment following a defendant's conviction in a parallel criminal case stemming from the same criminal offense. *See United States v. $405,089.23 U.S. Currency*, 33 F. 3d 1210, 1216 (9th Cir. 1994), *amended by*

order in the instant case where Defendant's interest has already been extinguished. The government's proper course of procedure in this case would have been to seek forfeiture on a timely basis or to seek a protective order against the escrow agent to prevent the re-delivery of the warranty deed to O'Dell, Jr. The criminal forfeiture scheme provides for such protective orders to ensure the availability of ephemeral interests during the pendency of a forfeiture proceeding. *See* 21 U.S.C. § 853(e).[12] Throughout the lengthy course this prosecution, the government had ample opportunity to protect its claimed interest in the farm property by requesting a protective order pursuant to 21 U.S.C. § 853(e) or by taking other appropriate steps to protect its interest, but failed to do so.

We must note that 21 U.S.C. § 853(n), which affords due process to third parties by allowing them to assert their

---

[12]Subsection (e) of § 853 provides:

(1) Upon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or *take any other action to preserve the availability of property described in subsection* (a) of this section for forfeiture under this section--
(A) upon the filing of an indictment or information charging a violation of this subchapter or subchapter II of this chapter for which criminal forfeiture may be ordered under this section and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section; or
(B) prior to the filing of such an indictment or information, if, after notice to persons appearing to have an interest in the property and opportunity for a hearing, the court determines that--
(i) there is a substantial probability that the United States will prevail on the issue of forfeiture and that failure to enter the order will result in the property being destroyed, removed from the jurisdiction of the court, or otherwise made unavailable for forfeiture; and
(ii) the need to preserve the availability of the property through the entry of the requested order outweighs the hardship on any party against whom the order is to be entered . . . .

it. At this point, Defendant's interest in the farm property was terminated according to the terms of the Escrow Agreement.

We acknowledge that § 853 has a relation-back clause providing that "[a]ll right, title, and interest in the property [owned by the defendant within the meaning of subsection (a)] vests in the United States upon the commission of the act giving rise to forfeiture under this section." 21 U.S.C. § 853(c). Therefore, the government takes the forfeited property that was in the hands of the defendant at the time of the offense, not at the time of conviction. *See In re Forfeiture Hearing As to Caplin & Drysdale, Chartered*, 837 F.2d 637, 640 (4th Cir. 1988); *In re Moffitt, Zwerling & Kemler, P.C.*, 846 F. Supp. 463, 476 (E.D. Va. 1995); *cf. United States v. Parcel of Land, Bldgs., Appurtenances and Improvements, Known as 92 Buena Vista Ave., Rumson, N.J.*, 507 U.S. 111, 125 (1993). Clearly, Defendant had an interest in the farm property as of August 15, 1991. But even though Defendant was specifically entitled under the agreement to purchase the property by continuing to make payments, he lost that right years ago by failing to make timely mortgage payments. Therefore, we cannot now order forfeiture of an interest that no longer exists.

That the government merely steps into Defendant's shoes is not debatable. In *United States v. Gurley*, Nos. 89-2384, 89-2418, 90-1071, 1990 WL 177318, (6th Cir. Nov. 13, 1990), a defendant contested the forfeiture of a motor home on the basis that the property belonged to his company and not to him. The government conceded that the defendant did not own certain property but sought to retain a criminal forfeiture order to "merely extinguish [ ] any interest" the defendant "may have" in the subject property. *Id.* at *7 (alteration in original) (quoting Government Brief at 45). We upheld the forfeiture order recognizing that it would not affect subsequent proceedings inasmuch as it would be of no consequence due to the fact that the defendant had no interest in the property. Essentially, the forfeiture order we upheld was meaningless. This result, however, does not compel us to reverse the district court's refusal to enter a meaningless

56 F.3d 41 (9th Cir. 1995) (noting that the government could seek forfeiture as part of a criminal prosecution without subjecting defendants to multiple and successive proceedings).[1] On October 14, 1994, Defendant filed numerous pretrial motions. The government responded on October 17, 1994, with a motion to dismiss the information "without prejudice", ostensibly to pursue other charges against Defendant and his family members through a grand jury. The government then alerted the district court to its double jeopardy concerns. On October 25, 1994, the district court granted the government's motion to dismiss the information without prejudice. At this point, two civil forfeiture actions were pending (one against Defendant's home at Tonawanda Trail and one against the 171-acre farm property) and there were no criminal charges.

On December 6, 1994, a federal grand jury returned a four-count indictment against Defendant charging him with the following: Count One, possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B); Count Two, manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B); Count Three, as owner, making an enclosure available for manufacture and storage of marijuana in violation of 21 U.S.C. § 856; and Count Four, a criminal forfeiture action pursuant to 21 U.S.C. § 853 seeking forfeiture of Defendant's interest in the property used to commit the crimes (Defendant's home at 266 Tonawanda Trail and the 171-acre farm property).

After the four-count indictment was returned, the government moved to dismiss the civil forfeiture action pending against the 171-acre farm property (3:92-cv-275), seeking to avoid possible double jeopardy concerns that would bar the criminal prosecution. This motion was granted on December 20, 1994 by U.S. District Judge James H. Jarvis.

---

[1] This decision was later reversed, *sub nom. United States v. Ursery*, 518 U.S. 267 (1996) (holding that *in rem* civil forfeitures were neither punishment nor criminal proceedings for the purposes of the Double Jeopardy Clause).

Subsequently, the government also sought dismissal "without prejudice" of the remaining civil forfeiture action against Defendant's home at 266 Tonawanda Trail (3:92-cv-487). Though Defendant had previously opposed the civil forfeiture claim, he contested the government's motion to dismiss the claim. In fact, he urged the district court to keep the civil and criminal proceedings separate, likely in an effort to preserve the double jeopardy issue. Defendant then filed a Motion for Partial Summary Judgment in favor of the government on the civil forfeiture action against his home at the Tonawanda Trail address. Defendant submitted this motion to U.S. District Judge Thomas G. Hull, who was not associated with the civil forfeiture action against the farm property, which was assigned to U.S. District Judge Jarvis. Defendant therein asked the district court to enter partial summary judgment for the government, failing to alert the district court to the government's double jeopardy concerns. Defendant claimed that he wanted to "finalize his position so that we [*sic*] can get on with his life." After the government opposed the partial summary judgment motion, the forfeiture case was assigned to Judge Jordan. Defendant also filed a Supplemental Memorandum in Opposition to the Government's Motion to Dismiss Without Prejudice. In that motion, Defendant asked the district court to enter summary judgment and alleged that AUSA Cook had made material misrepresentations upon which the district court had relied in dismissing the prior criminal case (the information). Defendant served the government with three interrogatories and subpoenaed AUSA Cook seeking to obtain information on the prosecutorial decision-making process. The government filed a motion to quash. Judge Jordan granted the government's motion to quash and denied Defendant's motion for partial summary judgment. But he also dismissed the civil forfeiture action "with prejudice." On May 1, 1995, the government filed a notice of appeal from this order and Defendant filed a cross-appeal on May 12 of the same year.

Defendant subsequently filed numerous motions to dismiss the criminal charges against him on *res judicata* and collateral estoppel grounds. On September 21, 1995, Judge Jordan

### 2. Termination of Defendant's interests under the Escrow Agreement

The government contends that it was entitled to an order immediately forfeiting whatever interest in the farm property Defendant had as of August 15, 1991, regardless of how this Court chooses to characterize that interest. Under ordinary circumstances, the broad meaning of the term property in § 853(a) would require forfeiture of such interests. But under the unique circumstances of this case such an order would be impossible to enforce because the interest had already been extinguished due to Defendant's failure to fulfill the terms of the Escrow Agreement. Although the government would usually be entitled to this precise interest, we believe the order would have been meaningless inasmuch as there was nothing for the district court to order forfeited.

The Escrow Agreement provided that it was "the desire and intention of the seller [O'Dell, Jr.] and the purchaser [Defendant] that the deed . . . be held in escrow until all of the indebtedness secured in the Deed of Trust . . . be satisfied in full and paid and the said lien be subject to release." (Escrow Agreement, J.A. at 651-52.) Defendant maintained his interest by making timely mortgage payments and paying taxes on the farm property. But the record shows that Defendant did not continue to satisfy those conditions. Shortly after his arrest on August 15, 1991, he stopped making payments to the bank holding the Deed of Trust. After being threatened with foreclosure by the bank, O'Dell, Jr. enforced the portion of the agreement allowing him to recall the deed upon default by Defendant or threat of foreclosure by the bank. O'Dell, Jr. then paid off the outstanding debt, obtained the Warranty Deed and destroyed

---

the right to alienate the property itself is one of the indicia of ownership of property. Defendant's right to dispose of his limited interest is not tantamount to the right to actually alienate the farm property itself. We therefore do not believe that the ability to dispose of such limited rights mandates a finding that Defendant was the owner of the property.

For this reason we find that the district court correctly determined that Defendant was not the owner of the property.

Nonetheless, under the terms of the Escrow Agreement, on August 15, 1991 Defendant did have a limited interest in the 171-acre farm property. In essence, Defendant had the right to make timely monthly payments reflecting the outstanding balance due on the loan and eventually own the property outright upon satisfaction of the terms of the Escrow Agreement. *See Town of Dandridge v. Patterson*, 827 S.W.2d 797, 800 (Tenn. Ct. App. 1992) (considering as an issue of first impression the property interest of the holder of an unexercised option to purchase real property involved in a condemnation proceeding and holding that the license feature of an option contract constitutes a legally protected property interest taking priority over a condemnation proceeding ); *cf. Lynch*, 168 S.W.2d 487 (1942) (holding that an option to purchase property does not create a present interest in land).[11]

---

Except in the case of wills and cases involving a future contingency, the conversion usually becomes effective at the date of the contract or deed indicating an intention to convert real estate into personalty.

In the case of options a future contingency, namely, the election of the optionee to take under the option which he may or may not do as he chooses, becomes the controlling factor and it seems illogical and unnatural to assume that the optionor intended a conversion at the date of the contract.

. . . the current and sounder rule is that conversion is effected on the date the optionee elects to exercise his option when, for the first time, the obligation to convey becomes absolute.

*Lynch*, 168 S.W.2d at 488.

[11]In its reply brief the government claims that even if Defendant could not have sold or otherwise of disposed of the property as its legal owner, he could have at least alienated his limited interest in the property. *Cf. Union Carbide*, 679 S.W.2d at 940 ("Carbide has no interest under the contract that it can sell, lease, or otherwise transfer. The mere use by Carbide of the real property for purposes of performing the contract does not amount to an incident of ownership."). The Escrow Agreement does not seem to restrict Defendant's rights such as to preclude his ability to alienate his limited rights. But this argument is inapposite inasmuch as

denied relief on most of Defendant's claims, but dismissed the portion of Count Four of the criminal indictment seeking forfeiture of the residence at 266 Tonawanda Trail. The next day, Defendant filed a notice of appeal pursuant to *Abney v. United States*, 431 U.S. 651 (1977) (permitting interlocutory appeal on a double jeopardy issue in criminal cases). The criminal prosecution was stayed at Defendant's request pending the disposition of the appeal. On October 12, 1995, the government filed a cross-appeal seeking reinstatement of the portion of Count Four that was dismissed by Judge Jarvis.

Approximately one year later, this Court, in a published opinion, reversed Judge Jarvis' dismissal of the civil forfeiture action with prejudice. *See United States v. One Tract of Real Property*, 95 F.3d 422 (6th Cir. 1996). In an unpublished opinion, we affirmed the denial of Defendant's motion to dismiss on double jeopardy grounds. We also granted the government's cross-appeal and reversed Judge Jarvis' dismissal of Count Four (the forfeiture count), remanding the case to the district court. *See United States v. O'Dell*, Nos. 95-6414, 95-6415, 1996, WL 515345 (6th Cir. Sept. 10, 1996).

After the case was remanded, Defendant moved to dismiss on October 21, 1995, claiming a violation of the Speedy Trial Act. On November 26, 1996, the magistrate judge filed a Report and Recommendation in which he concluded that seventy-four days had run on the Speedy Trial Act clock. In so recommending, the magistrate judge noted that the government was to blame for delay in prolonging its motion to dismiss the information. The magistrate judge then recommended dismissal of all counts of the indictment with prejudice. The government filed timely objections to this Report and Recommendation. On December 13, 1996, the district court dismissed with prejudice Count Two (manufacturing marijuana) and Count Three (use of an enclosure to manufacture and store marijuana), but retained Counts One and Four of the indictment. That same day, Defendant filed a notice of interlocutory appeal and the government filed its own notice of appeal. Again, upon

motion of Defendant, trial was stayed pending disposition of the appeal. On August 31, 1998, this Court dismissed Defendant's appeal but granted the relief sought by the government's appeal, reversing the district court's dismissal of Counts Two and Three on Speedy Trial Act grounds. *See United States v. O'Dell*, 154 F.3d 358 (6th Cir. 1998), *cert, denied*, 526 U.S. 1029 (1999).[2] The case was then remanded for trial. On September 14, 1998, although the Court of Appeals mandate had not yet been issued, Defendant filed a motion to dismiss the indictment, claiming his Sixth Amendment right to a speedy trial had been violated. On the same day, Defendant filed his first speedy trial motion. But despite his assertion that he wanted a speedy trial, Defendant also petitioned the Court for a rehearing *en banc*, which was objected to by the government and subsequently denied by this Court.

On November 13, 1998, three days after the district court regained jurisdiction, the government filed a Motion for Ruling on all Pending Motions and for Expedited Trial Date. The government's motion was granted and a trial date of February 16, 1999 was set. On December 9, 1998, the magistrate judge filed a Report and Recommendation recommending that Defendant's Sixth Amendment speedy trial claim be denied. On February 4, 1999, Defendant filed a conditional motion for continuance of trial, suggesting a

---

[2]In that case, we found that the majority of the time period alleged was excludable for purposes of the Speedy Trial Act:

Because the plain meaning of the statutory language requires a not guilty plea [in order to start the speedy trial clock for purposes of the Speedy Trial Act, 18 U.S.C. § 3161(c)(1)] and O'Dell did not enter one nor was one entered for him during the 1993 case, we hold that the STA clock was not triggered during the 1993 case. Thus, the District Court incorrectly held that sixty-three days of nonexcludable time elapsed during the 1993 case. Removing these sixty-three days from the STA clock leaves only thirty days at issue.

*O'Dell*, 154 F.3d at 362.

delivery of the deed upon the happening of certain conditions over which he had no control. Under the government's characterization, upon delivery of the Warranty Deed to the escrow agent O'Dell, Jr. had no power to recall the deed. Rather, the government claims that Defendant had complete control over the ultimate disposition of the deed and title because he could have eventually owned the property by making all the required payments. Therefore, the government contends that Defendant could have sold, leased, rented, or otherwise alienated the property, subject only to payment of the mortgage. But these rights are not stated in the Escrow Agreement, nor does the government cite any law--from Tennessee or otherwise--to support this proposition. As the district court noted, Defendant could not have sold or given away title to the property on August 15, 1991, because he did not have such title. *Cf. Sholodge*, 967 S.W.2d at 816 (recognizing that the party claiming an ownership interest could not alienate the property nor could it prevent the true owner from doing so). Rather, title remained in his father's name and the Warranty Deed remained with the escrow agent.

Furthermore, we decline the government's invitation to apply the doctrine of equitable conversion in this case. "The foundation for the doctrine of equitable conversion is a presumed intention of the owner, equity regarding as done that which ought to be done." *Lynch v. Burger*, 168 S.W.2d 487, 488 (Tenn. Ct. App. 1942); *see also Campbell v. Miller*, 562 S.W.2d 827, 832 (Tenn. Ct. App. 1977). In the instant case O'Dell, Jr. clearly intended that Defendant would have the right to obtain the property from O'Dell, Jr. subject to satisfaction of the terms of the Escrow Agreement. Thus, inasmuch as Defendant failed to live up to those terms, "that which ought to be done" has already been done in this case.[10]

---

[10]We decline to entertain the government's contention that Defendant should be considered the owner of the property as of the date the Escrow Agreement was executed. In *Lynch v. Burger* the Tennessee Court of Appeals explained the applicability of the equitable conversion doctrine to agreements in which a party has the option to purchase land:

But in deciding *Sholodge*, the court of appeals relied chiefly on the Tennessee Supreme Court's decision in *Union Carbide v. Alexander*, 679 S.W.2d 938 (Tenn. 1984). In considering whether the Union Carbide corporation had a taxable ownership interest in a parcel of real property which it managed and operated, the Tennessee Supreme Court discussed the six basic rights associated with the ownership of property:

> In a property assessment manual (International Association of Assessing Officers, Property Assessment Valuation (1977)), it is said that there are six basic rights associated with the ownership of property: (1) the right to use; (2) the right to sell; (3) the right to lease or rent; (4) the right to enter or leave; (5) the right to give away; (6) the right to refuse to do any of these.

*Id.* at 940. Although noting that Union Carbide had the rights to use the property to perform a contract, the court found that the corporation did not own the property for tax assessment purposes. In so holding the court noted that "the right to alienate is an important element of ownership," for in both *Union Carbide* and in *Sholodge* the parties allegedly having an ownership interest could not alienate the property. *Id.* at 941 (citing 63 Am. Jur. 2d *Property* § 47 (1972), at 331)). Similarly, in *Sholodge* the Tennessee Court of Appeals found that the right to use and enter or leave the premises did not constitute sufficient indicia of ownership. *Sholodge*, 967 S.W.2d at 816.

In the instant case, the government baldly asserts that Defendant possessed all six of these basic rights of ownership and that his father retained none of them. The parties do not dispute that Defendant possessed most of these rights prior to Defendant's default and the recall of the deed by O'Dell, Jr. But the right to alienate is a matter of some contention. According to the government's theory, once the Escrow Agreement was executed, the grantee (Defendant) had a superior interest in the property. The government alleges that only one right was retained by O'Dell, Jr.-- the right to re-

trial date in early April. Over the government's objection, the district court granted the motion, but delayed the trial only until March 3, 1999. On February 23, 1999, the district court adopted the report of the magistrate judge recommending that Defendant's Sixth Amendment speedy trial claim be dismissed.

On the morning of trial, Defendant waived his right to a jury trial and the case was tried before Judge Jordan. At trial, Defendant did not contest his guilt on Counts One (possession of marijuana with intent to distribute) or Two (manufacturing marijuana). But Defendant argued that he was not guilty of Count Three (as owner, making an enclosure available for manufacturing and storing marijuana) and that the district court should not order forfeiture of the 171-acre farm property. On May 21, 1999, the district court entered a memorandum and order finding Defendant guilty on Counts One and Two but not guilty on Count Three. Defendant filed an appeal of the judgment regarding Counts One and Two, docketed as Case No. 99-6155.

### B. Case No. 99-6153 (Application of the Safety Valve and Reduced Sentence)

Defendant's presentence investigation report ("PSIR") indicated that the mandatory minimum provisions of 21 U.S.C. § 841(b)(1)(B) applied, calling for a term of imprisonment of no less that five (5) years. (PSIR at 40). Defendant objected to this report and sought application of the safety valve protection of 18 U.S.C. § 3553(f), which would provide a sentence below the five-year minimum. The government responded to these objections, asserting that Defendant did not meet the fifth criterion for the safety valve because he did not provide all information and evidence he had concerning the offense that were part of the same course of conduct or of a common scheme or plan. Defendant's cooperation consisted chiefly of unhelpful information provided only hours before his sentencing hearing. Defendant refused to answer questions about marijuana growing activity aside from that undertaken in the barn on the farm property.

The government further alleged that even if the safety valve applied, a sentence below the minimum of twenty-four months would be in error.

Despite the government's concerns, the district court found that Defendant established eligibility for the safety valve, thereby, avoiding the mandatory minimum sentence of five years. The district court then applied a sentencing range of eighteen to twenty-four months, ultimately sentencing Defendant to eighteen months. The government filed a notice of appeal on the safety valve and sentencing issue, which was docketed as Case No. 99-6153.

### C.  Case No. 99-5759 (Criminal Forfeiture)

With respect to Count Four of the indictment, the district court ordered that Defendant's interest in the residential property at 266 Tonawanda Trail be forfeited, but declined to order forfeiture of Defendant's interest in the 171-acre farm property. Defendant's relationship to this property dates back to October 28, 1977. On that date, Defendant's father, Jackson C. O'Dell, Jr., executed a Warranty Deed conveying the 171-acre farm property to Defendant. This deed was not recorded, but was delivered to an escrow agent pursuant to a 1977 Escrow Agreement between Defendant and his father. The Escrow Agreement provided that the deed was to be held in escrow until Defendant satisfied his father's indebtedness on the property to the Federal Land Bank, at which time the escrow agent would be authorized to deliver the deed to Defendant. The Escrow Agreement also provided that O'Dell, Jr. could reclaim the deed if Defendant failed to meet the terms of the agreement, which required Defendant to make consistent and prompt payments to the bank holding the Deed of Trust on the property.

Defendant had continuous possession of the farm property for approximately fourteen years. Defendant's father even testified that he was sometimes denied access to the interior of the farm. From the time the deed was placed in escrow until the execution of the search warrants, Defendant maintained the 171-acre farm property and paid the mortgage,

Early Tennessee case law articulates the nature of delivery in transactions governed by an escrow agreement:

> An escrow is concisely defined as a *conditional delivery* of a deed to a stranger, and not to the grantee himself, until certain conditions shall be performed, and then it is to be delivered to the grantee. Until the condition is performed and the deed delivered over, the estate does not pass, but remains in the grantor.

*Parrott v. Parrott*, 48 Tenn. 681, 1870 WL 2735, at *2 (Tenn. 1872) (emphasis added). If delivery is conditional, there has been no delivery until the condition has been satisfied. *See Id.* at 412. Thus, the presumption of delivery does not apply in this case and Defendant did not have legal title to the farm property.

The government contends that the district court erred in focusing entirely on bare legal title and that it should have given greater weight to the fact that Defendant had dominion and control over the property. In support of this argument, the government relies on a broader definition of the term "ownership" used by the Tennessee Court of Appeals in *Frank Rudy Heirs Associates v. Sholodge, Inc.*, 967 S.W.2d 810 (Tenn. Ct. App. 1997). In *Sholodge* the court considered a claim by a limited partnership that its general partner breached a contractual agreement by obtaining an ownership interest in a competing enterprise. In finding that the partner did not acquire an ownership interest the court of appeals explained that "[t]he term 'ownership' has been given a wide range of meaning, but is often said to comprehend both the concepts of possession and, further, that of title and thus be broader than either." *Id.* at 816 (citing BARRON'S LAW DICTIONARY 339 (3d ed. 1991)). The court also cited Black's Law Dictionary, which defines the term "own" as "to have good legal title; to hold as property; to have a legal or rightful title to; to have; to possess." BLACK'S LAW DICTIONARY 996 (5th ed. 1979). Thus, the court recognized that the "ordinary and usual meaning of ownership is 'possession' or 'legal title.'" *Sholodge*, 867 S.W.2d at 816.

### 1.    Defendant's Interest in the Farm Property

The district court first framed its inquiry in terms of whether Defendant acquired legal title to the farm property. Such a holding would require a finding that the Warranty Deed had been "delivered" to Defendant such that he owned or had a legal interest in the property. Tennessee courts have long held that "the delivery of a deed from a grantor to a grantee is essential to pass title to the grantee." *Estate of Atkinson v. Allied Fence and Improvement Company, Inc.*, 746 S.W.2d 709, 711 (Tenn. Ct. App. 1988). To be effective, delivery must deprive the grantor of power to recall the deed, and delivery is complete only where the grantor has put the deed beyond his power to revoke or claim it. *See Couch v. Hoover*, 79 S.W.2d 807, 812 (Tenn. Ct. App. 1934). *But cf. Farrar v. Bridges*, 24 Tenn. (5 Hum.) 411, 413 (1844) (holding that signing, sealing, and attestation of a deed will make it complete and effectual, although the instrument may be left in the possession of the grantor). Under Tennessee law, delivery is a question of the intention of the parties, which may be inferred from the circumstances. *Allied Fence*, 746 S.W.2d at 712. *Cf. Early v. Street*, 241 S.W.2d 531, 534 (Tenn. 1951) (holding that delivery is a matter of intention to be determined from the grantor's words and conduct). The Escrow Agreement in the case at bar reflects the parties' intent that the deed not be delivered to Defendant until satisfaction of the remaining monthly mortgage payments.

In addition, possession and recordation of a properly executed and acknowledged deed by the grantee is *prima facie* evidence of delivery, absent opposing circumstances. *See Estate of Atkinson*, 746 S.W.2d at 712; *Jones v. Jones*, 206 S.W.2d 801, 804 (Tenn. 1947). In the instant case it is clear that Defendant was not the record owner of the property on the day in question and that he did not have physical possession of the Warranty Deed purporting to convey the farm property to him. Though O'Dell, Jr. signed the Warranty Deed over to Defendant, the deed was not delivered to Defendant because it was deposited with the escrow agent.

taxes, and utility bills. After Defendant's arrest, the government instituted a civil forfeiture action against the farm property. Soon after that action was filed, Defendant filed a verified claim that he was "entitled to ownership in the seized property as the owner of said property." Defendant ceased making payments on the property after his arrest and O'Dell, Jr. paid off the balance of the loan. But Defendant still claimed to own the property in his January 1994 summary judgment motion and at a suppression hearing on March 6-7, 1995. On March 3, 1999, however, the day before trial, Defendant filed a Notice of Disclosure and Retraction, reversing his longstanding position regarding his ownership of the 171-acre property. In this notice, Defendant acknowledged that at the start of trial he thought he was the owner of the farm property, but maintained that he never owned the farm property under Tennessee law.

Both parties agreed that the issue of whether the farm property was owned by defendant required some factual findings and asked the district court to hear evidence on this issue. They also agreed that the relevant time period for determining ownership was August 15, 1991--the date Defendant committed the criminal acts giving rise to the forfeiture claim. After hearing evidence on the ownership issue, which was integral to Count Three (as owner, making the property available for manufacture of marijuana), the district court declined to order forfeiture, finding instead that O'Dell, Jr. owned the property at the time in question.

### DISCUSSION

### I. Case No. 99-6155: SIXTH AMENDMENT SPEEDY TRIAL CLAIM

On cross-appeal, Defendant challenges the district court's denial of his request to dismiss the criminal indictment due to an alleged violation of the Sixth Amendment's speedy trial provision. For the following reasons, we affirm the district court's denial of Defendant's motion to dismiss.

### A.

"This Court examines *de novo* the constitutional question of whether a defendant has been denied a speedy trial in violation of the Sixth Amendment." *United States v. Brown*, 169 F.3d 344, 348 (6th Cir. 1999) (quoting *United States v. Smith*, 94 F.3d 204, 208 (6th Cir. 1996)). However, the district court's factual findings are reviewed for clear error. *See id.*

### B.

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend VI. We note that Defendant has already asserted and failed on a claim under the Speedy Trial Act, 18 U.S.C. § 3161. Although the government's compliance with the Speedy Trial Act does not bar future Sixth Amendment speedy trial provision claims, we have previously held that "it will be an unusual case in which the time limits of the Speedy Trial Act have been met but the Sixth Amendment right to speedy trial has been violated." *United States v. DeJesus*, 887 F.2d 114, 116 (6th Cir. 1989) (quoting *United States v. Nance*, 666 F.2d 353, 360 (9th Cir. 1982), *cert. denied*, 456 U.S. 918 (1983)); *see also United States v. Schlei*, 122 F.3d 944, 986 (11th Cir. 1997).

In *Barker v. Wingo,* 407 U.S. 514, 530 (1972), the Supreme Court identified four factors that district courts must consider in determining whether a defendant has been denied a speedy trial in violation of the Sixth Amendment: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the Defendant. Twenty years later the Court revisited the issue in *Doggett v. United States*, 505 U.S. 647 (1992) and refined the inquiry that district courts must pursue. The Court stated that it is necessary for district courts to balance "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy

purchaser of this property [Defendant] and the escrow agreement will thereby be terminated. In the event that the purchaser should fail to meet the payments of the federal Land Bank when due and if it should appear to the escrow agent, or to the seller [Defendant's father], that said default had continued for a period of ninety (90) days, or for a smaller period, if the holder of said lien should be threatening with or proceeding to foreclose, then and in that event, the escrow agent is hereby authorized to redeliver said deed to the seller . . . . If the seller should pay the indebtedness due to the Federal Land Bank as contemplated herein prior to its due date, then the deed shall be delivered to him on satisfactory evidence of such payment and the release of lien securing the same.

(Escrow Agreement, J.A. at 652-53.) Although Defendant at one time claimed to own the property in question, he now claims no interest and asserts that he was never the owner of the property. The government argues at least two alternative bases for finding that Defendant had a cognizable legal interest in the property when he committed the criminal acts giving rise to the forfeiture action: that Defendant owned the farm property and that he had some other interest in the property. Although we believe the district court correctly determined that Defendant did not have legal title to the farm property, he did have some interest in the property by virtue of the Escrow Agreement on August 15, 1991. Thus, in theory, the district court should have ordered Defendant to forfeit this interest. But, as we will discuss, the evidence adduced at trial showed that this interest had already been extinguished years prior to the time the government obtained the indictment seeking forfeiture. By corollary, the government's interest was also terminated. Therefore we hold that the district court's failure to order forfeiture of that interest does not constitute reversible error because there was nothing for the district court to have ordered forfeited.

Thus, we must determine what, if any, interest Defendant had in the property that the government now claims. The parties agree that "the question of whether Defendant had an interest in the property must be determined by reference to state property law--in this case, the state of Tennessee. *See United States v. Smith*, 966 F.2d 1045, 1054 n.10 (6th Cir. 1992).[9]

Defendant's relationship to the farm property stems from a 1977 Warranty Deed and Escrow Agreement entered into with his father, Jackson O'Dell, Jr. In October of that year, O'Dell, Jr. executed a Warranty Deed conditionally conveying the 171-acre farm to Defendant. The consideration for this conveyance was Defendant's agreement to pay the balance due on the mortgage originally obtained by O'Dell, Jr. To memorialize this agreement, the parties entered into an Escrow Agreement, which reads, in relevant part:

5. Upon the payment by the purchaser of all the payments due to the Federal Land Bank under the Deed of Trust aforesaid and upon the presentation of evidence of such payment and release of the lien to the escrow agent, the escrow agent is authorized to deliver said deed to the

---

[9] *But cf. United States v. Morgan*, 224 F.3d 339 (4th Cir. 2000) (using dominion and control test to determine whether a third-party petitioner under § 853 (n) had a property interest in banking accounts and certificates of deposit). The *Morgan* court looked to congressional intent "to deny relief to third parties acting as nominees of Defendant or who knowingly engage in sham transactions." This case is not precisely on point with the case at bar. *Morgan* dealt with the Article III standing of a third party claimant subsequent to a forfeiture order that vested ownership in the government. The instant case considers the property interests of a criminal defendant prior to an order of forfeiture. Moreover, no evidence of such a sham transaction is present or even alleged in the instant case. In fact, the transaction in question--the Escrow Agreement-- was executed nearly fifteen years prior to Defendant's arrest. Furthermore, other courts have consistently applied relevant state law in determining whether a third party has such a property interest. *See, e.g., United States v. Hooper*, 229 F.3d 818, 820 n.5 (9th Cir. 2000) (expressly rejecting the test used in *Morgan*).

trial, and whether he suffered prejudice as the delay's result." *Id.* at 651 (citing *Barker*, 407 U.S. at 530). None of these factors alone is sufficient to establish a violation of the Sixth Amendment. Instead, the Supreme Court declared that "these are related factors and must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533. When a defendant's constitutional right to a speedy trial has been violated, dismissal of the indictment is the only remedy even when it allows a defendant who may be guilty of a serious crime to go free. *See id.* at 522.

## 1. Length of the Delay

In all Sixth Amendment speedy trial cases, the length of the delay is the triggering mechanism. As the *Doggett* Court stated, "simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay, since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." *Doggett*, 505 U.S. at 651-52 (citations omitted). In the instant case, the parties agree that the delay before trial is sufficient to trigger speedy trial concerns.

## 2. Reasons for the Delay

If a defendant shows a delay sufficient to trigger speedy trial concerns, the district court must then address the related issue of reasons for the delay. The core task is determining which party shoulders the balance of blameworthiness for this delay.[3] In analyzing this factor, the Supreme Court has noted that "different weights should be assigned to different reasons" for delay. *Barker*, 407 U.S. at 531. Thus, the Supreme Court held in *Barker*:

---

[3] The importance of this factor cannot be underestimated. Indeed, the Supreme Court has recognized that "[t]he flag all litigants seek to capture is the second factor, the reason for delay." *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986).

A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Id.* (footnote omitted). The Court further noted in a footnote: "We have indicated on previous occasions that it is improper for the prosecution intentionally to delay 'to gain some tactical advantage over (defendants) or to harass them.'" *Id.* at 531 n. 32 (citing *United States v. Marion*, 404 U.S. 307, 325, (1971)). But the Court has delivered equally strong language indicating that defendants might also engage in strategic delay:

Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to counsel or the right to be free from compelled self-in-crimination [sic], deprivation of the right to speedy trial does not per se prejudice the accused's ability to defend himself.

*Barker*, 407 U.S. at 521. Thus, Defendants do not have carte blanche in asserting constitutional speedy trial claims.

In addition to these improper reasons for delay, courts have also designated presumptively justifiable reasons, including resolution of pretrial motions. *See, e.g., United States v. Schlei*, 122 F.3d 944, 987 (11th Cir. 1997) (delay due to resolution of pretrial motions did not trigger violation of Sixth Amendment right to a speedy trial); *United States v. Jones*, 91 F.3d 5, 8 (2d Cir. 1996) (holding that "legitimate pretrial

We agree that the language of § 853(a) is mandatory. *Cf. United States v. Parcel of Land, Bldgs., Appurtenances and Improvements, Known as 92 Buena Vista Ave., Rumson, N.J.*, 507 U.S. 111, 137 (1993) (noting that the criminal forfeiture scheme protects the interests of transferees but only through a procedure that postdates forfeiture). But we also recognize that it only entitles the government to forfeiture of a convicted defendant's interests and nothing more. *See United States v. Lavin*, 942 F.2d 177, 185 (3d Cir. 1991) (holding that "if a third party's interest in the forfeited property, at the time of the criminal acts, was superior to the criminal defendant's interest, then the interest that the government acquires when it steps into the defendant's shoes is subordinate to that of the third party); *Kuhn v. Vista Disposal, Inc.*, 826 F. Supp. 218, 224 (E.D. Mich. 1993) ("The government, through forfeiture, simply steps into the defendant's shoes. Thus, the government can acquire through forfeiture no greater interest than the defendant held at the time the defendant committed the criminal acts.") (citation omitted); *cf. United States v. Certain Real Property Located at 225 Leroy Lane, West Bloomfield, Michigan*, 910 F.2d 343, 350 (6th Cir. 1990) (holding that while the federal forfeiture scheme allows the government to assume a defendant's interests in property, it may not by virtue of the forfeiture order alter the essential characteristics of a tenancy by the entireties estate). In *Leroy Lane*, we recognized that allowing the government immediate access to a convicted defendant's share of an entireties estate "would vest the [g]overnment with a greater interest than that held by the wrongdoer whose interests the [g]overnment has acquired . . . ." *Id.* This premise is particularly true due to the *in personam* nature of criminal forfeiture proceedings as compared to civil forfeiture proceedings in which liability attaches to the property itself. "The criminal forfeiture provisions of 21 U.S.C. § 853 authorize an *in personam* action against a defendant in a criminal case, and forfeiture in such a case is imposed as a sanction against the defendant upon his conviction. Civil forfeiture, on the other hand, is an *in rem* proceeding wherein the subject property is treated as being itself guilty of wrongdoing." *See Leroy Lane*, 910 F.2d at 346 (citations omitted).

conclusion would be the same. *O'Dell, Jr. was the owner of the property at the time of the offense and the government was not entitled to a forfeiture.* Given the unusual state of proof in this case, the court can find no just reason to delay its judgment that the government is not entitled to forfeit the 171 acre farm property.

(District Court Order, J.A. at 574-75.) (emphasis added)

On appeal, the government claims that under 21 U.S.C. § 853(a) once a defendant is convicted and the appropriate nexus is drawn between his criminal conduct and the property at issue, the district court must automatically order forfeiture of a defendant's interests in the subject property regardless of the nature of that interest. That statute provides, in pertinent part:

Any person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year *shall forfeit* to the United States, irrespective of any provision of State law . . . (2) *any of the person's property* used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation

. . .

The court, in imposing sentence on such person, *shall order*, in addition to any other sentence imposed pursuant to this subchapter or subchapter II of this chapter, that the person forfeit to the United States all property described in this subsection.

21 U.S.C. § 853(a) (emphasis added). Another provision of § 853 defines "property" as (1) real property, including things growing on, affixed to, and found in land; and (2) tangible and intangible personal property, *including rights, privileges, interests, claims*, and securities." 21 U.S.C. § 853(b) (emphasis added).

proceedings are 'neutral reasons not attributable to the government'").

In an attempt to cast the facts in the light most favorable to their respective positions, each party in the case at bar argues at length its own version of the procedural history. Defendant alleges that after he entered into a plea agreement, AUSA Cook made affirmative misrepresentations regarding his intentions to charge Defendant's father and sons with crimes. Defendant contends that the AUSA concealed his alleged true intent, which was to avoid possible double jeopardy problems stemming from the civil forfeiture action on the farm property. Among other factors, Defendant notes that after the AUSA threatened prosecution for many months and voluntarily dismissed the information, the government eventually brought no charges against his father and sons. Defendant also points to the fact that the government acknowledged its double jeopardy problem in moving to dismiss the civil forfeiture action the day after the present indictment was filed. (J.A. at 455.) Defendant further argues that the interlocutory appeals that delayed his trial from October 25, 1994 to March 3, 1999 would have all been unnecessary if the government had proceeded to sentencing pursuant to the plea agreement instead of inviting Defendant to withdraw his guilty plea. Defendant also contends that the third interlocutory appeal was useless because it was clear that the Sentencing Guidelines would have caused Defendant's sentences to be served concurrently. As a result, additional charges would have resulted in no additional jail time. Finally, Defendant points to statements made by the magistrate judge and the district court indicating that the government was to blame for the delays:

The largest part of the delay in this case was occasioned by the government in [the 1993 case] prolonging its motion to dismiss the information in that case. The government has not proceeded in a diligent manner in this prosecution and Judge Jordan so noted in a Memorandum and Order filed on September 21, 1995.

The court is aware that the government has attempted to manipulate the court in order to save its criminal prosecution of the defendant as well as the forfeiture of his assets. With the dismissal of the defendant's residence from Count IV of the indictment, the government and the defendant are in nearly the same position they were when the information was filed and the defendant plead guilty. In its effort to protect all its options, the government has prolonged this prosecution beyond what would be seen as necessary.

The government has proceeded with five separate actions against this defendant over the past five years and has already obtained various dismissals, all of which were obtained for the purpose of preserving the government's criminal prosecution in this case during a time when the law was unclear as to whether a civil forfeiture would preclude criminal prosecution when both actions revolved around the same conduct.

(Report and Recommendation of Magistrate Judge, J.A. at 743-44.) (citing to district court Memorandum and Order granting Defendant relief on Speedy Trial Act claim) The Report and Recommendation went on to state: "Thus, Judge Jordan's observation that the delays in this case are not the result of mere negligence or oversight by the government, but appear to have been rather deliberate in an attempt to 'protect all its options' is well-founded." (*Id.*, J.A. at 749.)

In response, the government asserts that much of the delay was due to litigating Defendant's pretrial motions. First, the government cites to the dozens of motions, motions to reconsider, and objections filed by Defendant over the years. The district court noted these numerous motions in denying Defendant's Sixth Amendment speedy trial claim:

[T]here were several reasonable explanations for the delay. One of the primary reasons for the delay in bringing this case to trial was the number of pretrial motions filed by the defendant in this case. Without taking the time to actually count all of the defendant's

**B**.

We review the district court's interpretation of the federal forfeiture laws *de novo*. *See United States v. Hill*, 167 F.3d 1055, 1073 n. 13 (6th Cir. 1996); *United States v. 1980 Lear Jet, Model 35A Serial No. 277*, 38 F.3d 398, 400 (9th Cir. 1994). But the district court's findings of fact are reviewed under a clearly erroneous standard and the question of whether those facts are sufficient to constitute a proper criminal forfeiture is reviewed *de novo*. *United States v. Marmalejo*, 89 F.3d 1185, 1197 (5th Cir. 1996).

**C**.

Count Four of the indictment sought forfeiture of "any and all interest" Defendant had in both the 171-acre farm property and the residence at the Tonawanda Trail address pursuant to 21 U.S.C. § 853. After his conviction on the first three counts charged in the indictment, Defendant contested the forfeiture and argued that he did not actually own the 171-acre farm property. The district court agreed and found that the 171-acre farm was not subject to forfeiture:

[T]he government argues that all it needs to prove is that the property was used to facilitate the marijuana growing operation, and this has been proven by a preponderance of the evidence. Thus, the government argues that it is entitled to an order of forfeiture in whatever interest the defendant had in the property on August 15, 1991 [and] any other claims on the property could be litigated in a subsequent proceeding. Under most circumstances this argument might carry the day, but in this case the issue of ownership of the property has been extensively litigated before this court. All of the relevant documents have been introduced into evidence, and all of the persons with knowledge or interest in the property have testified. Assuming that the court ordered the forfeiture as suggested by the government, O'Dell, Jr. would certainly request a hearing pursuant to 21 U.S.C. § 853(n) to protect his third party interests, all of the evidence presently before the court would be reintroduced, and the

punishment, but a criminal charge to be proved like any other." 929 F.2d at 1548. After weighing these holdings, we opted to follow the Third Circuit's holding in *Sandini*:

However ambiguous section 853 may be, it expressly provides that a court shall order criminal forfeiture "in addition to any *other sentence*" at the time that it imposes the sentence. Although a criminal forfeiture proceeding bears some characteristics of a criminal matter, its purpose is to determine the proper punishment for the charged offense once the defendant's guilt on that charged offense had been proved beyond a reasonable doubt.

*Smith*, 966 F.2d at 1052.

Defendant cites to no Sixth Circuit case law abrogating our holding in *Smith*. Instead, he cites Supreme Court precedent holding that the nature of what constitutes an acquittal is not controlled by the form of a judge's action or by the label attached to that action by the district court. *See United States v. Sisson*, 399 U.S. 267 (1970). Defendant also cites *United States v. Martin Linen Supply Co.*, 430 U.S. 564 (1977), in arguing that the jurisdiction of the appellate court is determined by examining whether the district court actually represents a resolution of some or all of the factual issues of the offense charged. We do not take issue with these decisions. But they do not operate to undermine the principle that the appeal by the government of a criminal forfeiture does not invoke double jeopardy concerns. As the Supreme Court held in *Martin Linen Supply Co.*, "where a government appeal presents no threat of successive prosecutions, the Double Jeopardy Clause is not offended." 430 U.S. at 569-70. Clearly, if the government is successful in its appeal in the instant case Defendant will not be retried for he has already been convicted of the substantive offense. We therefore believe the government's appeal presents a justiciable issue.

motions, it is enough to note that there are well over 200 docket entries in this case. In addition, the defendant has filed two interlocutory appeals to the Sixth Circuit with cross-appeals by the government. These two factors alone have caused much of the total delay in bringing this case to trial.

. . .

[M]ultiple motions have been filed by defendant, including a motion for a continuance of the trial date due to a scheduling conflict of the defendant's counsel. . . . Sentencing was set in January 1994 and, at least once, if not twice, the defendant's hearing was continued at the defendant's request. Thereafter, of course, the whole deal fell apart and the defendant withdrew his plea of guilty.

(Memorandum and Order dismissing Defendant's Sixth Amendment speedy trial claim, J.A. at 610-11.) The government also points to the fact that the references made in the report and recommendation and quoted by Defendant related to a 74-day time period in the 1993 pre-indictment case against Defendant, the majority of which we previously found excludable for Speedy Trial Act purposes. *See O'Dell*, 154 F.3d at 360-62. Indeed, the magistrate judge noted in rejecting Defendant's Sixth Amendment speedy trial claim, "The undersigned has been critical of the government in connection with the handling of the prior case involving the Information in the instant case. . . . But the actions criticized do not add up to a Sixth Amendment speedy trial violation under the circumstances." (Report and Recommendation, J.A. at 598.)

In reviewing the procedural history, we conclude that the government is not more to blame for the delays in this trial. We accept the government's contention that it reported the breach of the plea agreement in order to give the Defendant an opportunity, if he so chose, to withdraw his guilty plea, which it appears that he did. Although the government informed the district court of Defendant's breach of the plea agreement, it

did not seek any relief and did not seek to withdraw from the agreement. Defendant alleges that AUSA Cook somehow influenced the state authorities' unwillingness to strike a favorable plea bargain with his father and sons in an effort to undermine his own plea agreement. But these allegations are vague and completely unsupported by the record. We believe that Defendant's withdrawal of his guilty plea belies his claim that he wanted to proceed to sentencing. Moreover, if Defendant truly wanted to proceed to trial, he would have done so instead of filing multiple appeals and requesting numerous stays of trial.

We also disagree with Defendant's charge that the third interlocutory appeal was "useless." In that appeal, the government appealed from the district court's dismissal of Counts Two and Three of the indictment, charging Defendant with growing marijuana and using an enclosure to manufacture and store the marijuana, respectively. (J.A. at 752.) The government argues that though it realized the sentences would run concurrently, it sought reinstatement of the charges because its proof on Count Two was the strongest inasmuch as Defendant could not deny that he was growing marijuana in the barn. The government also acknowledged that reinstatement of the counts strengthened its position with respect to the criminal forfeiture claim, Count Four. Upon interrogation by the district court as to the government's motivation for such an appeal, the AUSA responded: "Judge, I think a lot of it goes to the forfeiture. Counts Two and Three are distinct, separate grounds, which is important to the forfeiture . . ." (J.A. at 795.) We find this to be a valid and non-frivolous basis for seeking to retain all counts of the indictment.

Although we cannot divine the parties' intent in filing the various motions, we can say with some degree of certainty that they were all submitted to some strategic end. But despite the fact that numerous strategies were employed, we cannot say that the tactic of either party was actually to delay the trial. Moreover, Defendant filed a motion to dismiss based on a speedy trial violation on the same day he moved

proceeding or as something more akin to a sentencing proceeding. Highlighting the fact that forfeiture requests must be stated in the indictment, Defendant argues that the district court's decision not to order forfeiture of the farm property was the functional equivalent of a verdict of acquittal.[7] But the Supreme Court rejected this argument in *Libretti v. United States*, 516 U.S. 29, 38-39 (1995) ("Forfeiture is an element of the sentence imposed following conviction or, as here, a plea of guilty. . . . Congress plainly intended forfeiture of assets to operate as punishment for criminal conduct in violation of the federal drug and racketeering laws, not as a separate substantive offense."). The First Circuit reached a similar conclusion in *United States v. Cunningham*, 201 F.3d 20, 24 (1st Cir. 2000), wherein it recognized that "[t]he Supreme Court has clearly established that forfeitures made pursuant to the federal drug and racketeering statutes are elements of the sentence, rather than a part of the criminal offense itself."

Moreover, in *United States v. Smith*, 966 F.2d 1045 (6th Cir. 1992), we reviewed the holdings of our sister circuits that have considered the nature of criminal forfeiture authorized by 21 U.S.C. § 853.[8] In *Smith*, we first examined *United States v. Sandini*, 816 F.2d 869 (3d Cir. 1987), in which the Third Circuit held that "forfeiture is not an element of the . . . offense, but simply an additional penalty for that proscribed conduct." 816 F.2d at 875. We next considered *United States v. Elergsma*, 929 F. 2d 1538 (11th Cir. 1991), in which the Eleventh Circuit rejected the Third Circuit's holding in *Sandini*, holding instead that "criminal forfeiture is not

---

[7] *See* FED. R. CRIM. P. 7(c)(2) ("No judgment of forfeiture may be entered in a criminal proceeding unless the indictment or the information shall allege the extent of the interest or property subject to forfeiture.").

[8] Though these cases decided the proper burden of proof for criminal forfeiture under § 853 (preponderance of the evidence), this determination hinged upon our sister courts' characterizations of the forfeiture proceeding in a manner consistent with the characterization set forth in this opinion.

### III.  Case No. 99-57659:  CRIMINAL FORFEITURE CLAIM

The government also appeals from the district court's failure to order forfeiture of the 171-acre farm property pursuant to 21 U.S.C.§ 853.  The government contends that it need not prove the extent of a defendant's interest in property prior to obtaining a criminal forfeiture order.  Although we agree with this premise in principle, the circumstances of this case do not compel us to find that the district committed reversible error.

#### A.

As a threshold matter, Defendant challenges this Court's jurisdiction to hear the government's appeal.  Defendant claims that he was initially placed in jeopardy when the district court considered the government's forfeiture claim and that to permit an appeal would again place him in jeopardy in violation of the Double Jeopardy Clause of the Fifth Amendment.[6]  U. S. CONST. amend. V.  The Double Jeopardy Clause has traditionally prevented the retrial of a criminal defendant who has been acquitted of the crime charged.  *See United States v. DiFrancesco*, 449 U.S. 117, 129-30 (1980).  This protection extends to both jury trials and bench trials.  *See Smalis v. Pennsylvania*, 476 U.S. 140 (1986).  But the Supreme Court has resisted attempts to extend the protection of the Double Jeopardy Clause to sentencing.  *See Bullington v. Missouri*, 451 U.S. 430, 438 (1980).  Thus, whether Defendant is exposed to a danger of double jeopardy hinges upon the characterization of the criminal forfeiture proceeding as either a substantive criminal

---

[6]Defendant does not challenge the government's statutory authorization to appeal a sentence under 18 U.S.C. § 3742, which provides that the government may file a notice of appeal for the review of an otherwise final sentence if it "was imposed in violation of law" and upon "the personal approval of the Attorney General, the Solicitor General, or a deputy solicitor general designated by the Solicitor General."  The government did obtain the approval of former Solicitor General Seth Waxman.

the district court for a speedy trial.  As the district court indicated, it could not speed the trial along until it regained jurisdiction from this Court after its decision on an interlocutory appeal.  Furthermore, the district court's initial finding that the government caused delay poses no barrier to our finding that the government is not more to blame for the delay, for we later determined that this period of delay did not count against the speedy trial clock.  Moreover, any delay attributable to the government is  balanced by Defendant's own strategic machinations.

As the Supreme Court noted in  *United States v. Loud Hawk*, 474 U.S. 302, 316 (1996), "[a] defendant who resorts to an interlocutory appeal should not be able upon return to the district court to reap the reward of dismissal for failure to receive a speedy trial."  The *Loud Hawk* Court considered the extent to which appellate time consumed by the review of pretrial motions should weigh in favor of a defendant's speedy trial claim.  Balancing speedy trial concerns with the need for orderly appellate review, the Court found that the delay attributable to interlocutory appeals did not count towards the defendant's speedy trial claims.  *See id.* at 316-17.  The Court found particularly persuasive the fact that the defendant's appeals were frivolous.  We do not question the validity to Defendant's appeals in the instant case.  Rather, it is the numerosity and frequency of those appeals which guides our finding that Defendant's culpability with respect to delay is at least equal to that of the government.  Thus, neither party is completely free of blame for the ensuing delays.

### 3.  Defendant's Assertion of His Right

We next consider whether Defendant asserted his right to a speedy trial.  In *Barker v. Wingo*, the Supreme Court emphasized that "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial."  407 U.S. at 532.  Defendant contends that he "surely and certainly" asserted his right to a speedy trial, asserting that he moved the district court for a speedy trial after this

Court delivered its panel opinion in the third interlocutory appeal. Defendant also contends that his attempts to enforce the plea agreement served to make it clear that he wanted to proceed to sentencing. Defendant presents these attempts as evidence that he invoked the right to a speedy trial. The district court found this logic unpersuasive:

> The first, and only, motion demanding a speedy trial pursuant to the Sixth Amendment was filed on September 14, 1998. As the mandate was not issued from the Sixth Circuit until November 10, 1998, this court did not have jurisdiction over the defendant's motion until that date. Since [that time], multiple motions have been filed by defendant, including a motion for a continuance of the trial date due to a scheduling conflict of the defendant's counsel, yet the trial is set for March 3, 1999, and no further delays are anticipated.

> The defendant argues that his efforts to have the court enforce an unenforceable plea agreement should somehow be considered as an assertion of his Sixth Amendment rights. To this court's mind this argument stretches credulity. The defendant entered his plea to the information in November 1993. Sentencing was set in January 1994 and, at least once, if not twice, the defendant's hearing was continued at the defendant's request. Thereafter, of course, the whole deal fell apart and the defendant withdrew his plea of guilty. This court finds . . . that this factor weighs against defendant since he has only recently made a Sixth Amendment demand for a speedy trial, and the defendant's trial has been set as timely as his counsel would allow.

(Memorandum and Order, J.A. at 611-12.) The Supreme Court considered a similar claim in *Loud Hawk*, finding that the Sixth Amendment right to speedy trial was not properly invoked in light of the circumstances:

> Although the Court of Appeals found that respondents have repeatedly moved for dismissal on speedy trial grounds . . . that finding alone does not establish that

We believe that this request is yet another attempt to shift the burden, this time to the district court, to ensure that sufficient facts are on the record to satisfy the safety valve requirements. We recently held in *United States v. Hoskins*, 173 F.3d 351 (6th Cir. 1999), that the district court has no burden to provide any such findings to a defendant:

> [D]efendant's contention that the district court must make findings in regard to 18 U.S.C. § 3553(f) is simply not supported by the plain reading of the statute. There is nothing that states a district court must make a finding in regard to section 3553(f). Moreover, as [USSG] § 5C1.2(5) makes clear, it is the burden of the defendant to provide pertinent information, no later than the time of the sentencing hearing. Defendant failed to do so in the present case.

*Hoskins*, 173 F.3d at 357. Rather, we agree with the government's assertion that Defendant's decision not to provide more information in the first instance instead of making a more fulsome disclosure was a "risky gamble." *See United States v. Montanez*, 82 F.3d 520, 523-24 (1st Cir. 1996). We also find that remand to the district court for further consideration of the safety valve issue would be illogical on policy grounds. As the government aptly noted, "[i]f a Defendant can withhold information, claim he has carried his burden, and then restart the whole process if any court along the way disagrees, the statutory requirement that the information be provided 'not later than the sentencing hearing' would be rendered meaningless." (Reply Brief of United States as Plaintiff-Appellant, at 47).

### C.

Based on the above evidence, we hold that Defendant failed to satisfy his burden to establish eligibility under the safety valve provision and that the district court's finding that he did establish such eligibility was clearly erroneous. We therefore vacate the district court's judgment and remand for re-sentencing without application of the safety valve.

answer." (J.A. at 1082.) This statement implies that information regarding Defendant's father and sons would be irrelevant because they could no longer be charged in relation to the offenses. Likewise, Defendant also contends that he believed that as of August 15, 1991, the government had all relevant information regarding the offenses. But, as a sister circuit noted in a strikingly similar case, this belief is irrelevant. In *United States v. Myers*, 106 F.3d 936 (10th Cir. 1997), a defendant told the FBI all that he knew about his own actions, but refused to provide other information, such as who his buyers were or the names of others connected to his operation. It appeared that the defendant did not provide additional information because he did not think it would be helpful to the government. Against this factual background, the Tenth Circuit held that:

> section 5 requires disclosure "whether or not it is relevant or useful to the government's investigation." *United States v. Shrestha*, 86 F.3d 935, 939 (9th Cir. 1996); *see also Acosta-Olivas*, 71 F.3d at 379. The burden was on Mr. Myers to prove that he met the five criteria contained in § 3553(f). *United States v. Verners*, 103 F.3d 108, 109-10 (10th Cir. 1996). He failed to carry that burden.

*United States v. Myers*, 106 F.3d 936, 941 (10th Cir. 1997), *cert. denied*, 520 U.S. 1270 (1997). Similarly, in the case at bar Defendant's actions failed to satisfy the requirements of section five of the safety valve provisions. Similar to the defendant in *Myers*, the record reflects that in the instant case Defendant also refused to answer questions directly posed to him by the U.S. Attorney regarding marijuana activity in places other than his barn. (Sentencing Hearing, J.A. at 1075.) Even at his sentencing hearing, Defendant refused to answer certain questions, responding that he was not required to provide such information.

Defendant also contends that he relied on the district court's interpretation of the statute and that if we disagree with that interpretation that the case should be remanded to give him another opportunity to answer additional questions.

respondents have appropriately asserted their rights. We held in *Barker* that such assertions from defendants are "entitled to strong evidentiary weight" in determining whether their rights to a speedy trial have been denied. These assertions, however, must be viewed in the light of respondents' other conduct. Here, respondents' speedy trial claims are reminiscent of Penelope's tapestry. At the same time respondents were making a record of claims in the District Court for speedy trial, they consumed six months by filing indisputably frivolous petitions for rehearing and for *certiorari*.

474 U.S. at 314 (citation omitted) (footnote omitted).[4] Given the multitude of motions filed by Defendant, we believe that he has woven such a self-destructive tapestry in the instant appeal. In light of Defendant's own conduct, we cannot say that he effectively asserted his constitutional right to a speedy trial. For these reasons, Defendant has not convinced this Court that the district court's finding that he did not timely assert his right to a speedy trial was clearly erroneous.

### 4. Prejudice to the Defendant

In *Barker*, the Supreme Court provided guidance on the issue of prejudice to a defendant:

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.

---

[4] The Court's reference to Penelope's tapestry is from HOMER, THE ODYSSEY, Book II, lines 91-105 (R. Lattimore trans. 1965).

*Barker*, 407 U.S. at 532 (footnote omitted). Recently, the Third Circuit noted that the next most important interest of a defendant is the need to prevent oppressive incarceration. *See United States v. Dent*, 149 F.3d 180, 184 (3d Cir. 1998) (finding that fewer speedy trial concerns are implicated where a defendant is not detained during the delay). In accordance with these decisions, the district court found that the key issue in determining prejudice was whether Defendant's ability to prepare a defense and present testimony at trial was impaired by the length of the delay. (Memorandum and Order, J.A. at 613.) The district court found that Defendant made absolutely no showing of such impairment. *See id.*

On appeal, Defendant points to the recommendations of the magistrate judge and the order of the district court in his Speedy Trial Act claim to show that he was prejudiced. Using these findings as a foundation for an initial speedy trial problem, Defendant invokes the *Doggett* decision for the proposition that "[t]he presumption that pretrial delay has prejudiced the accused intensifies over time." 505 U.S. at 652. Defendant asserts that the government produced no evidence to rebut this presumption. But this argument fails, for it is based on the premise that the delay is attributable to the government. In considering Defendant's Speedy Trial Act claim, the district court dismissed Counts Two and Three, but we reversed, finding that the Act did not apply to the time period in question. As noted above, though defeat on a Speedy Trial Act claim does not bar a similar Sixth Amendment claim, it will be persuasive in considering the merits of the constitutional claim. *Cf. United States v. DeJesus*, 887 F.2d 114, 116 n.1 (6th Cir. 1999) (declining to consider a Sixth Amendment speedy trial claim after resolving a Speedy Trial Act claim against defendant).

In his reply brief, Defendant claims that the district court improperly focused on the third concern articulated in *Barker* and failed to fully consider that the Sixth Amendment's speedy trial provision also protects criminal defendants from a lengthy period of "anxiety and concern," and that particularized proof of prejudice is not essential to every

were lawfully sold. The record reflects that Defendant did not provide any information regarding his co-conspirators. Defendant also claims that he should somehow be accorded some protection because he filed a motion for written notice of any further information or evidence the government may contend would be necessary to fulfill the safety valve provision. In fact, Defendant argues that the government waived review of the safety valve issue by failing to respond to his motion. Defendant also contends that he should be afforded some protection because he asked the district court to advise him on whether had made a sufficient showing to satisfy the safety valve requirements. Finally, Defendant claims that he answered all the questions posed to him by the government and thereby fulfilled the fifth safety valve criterion. We disagree with all of these contentions.

Under the safety valve provision, a defendant has the burden to prove that the criteria have been satisfied. The government has no obligation to solicit information that could help a defendant meet the requirements for the safety valve. Therefore, merely answering all questions posed by the government may not be sufficient to qualify for the fifth criterion of the safety valve. *See United States v. Adu*, 82 F.3d 119, 124 (6th Cir. 1996) ("These provisions clearly require an affirmative act by the defendant truthfully disclosing all the information he possesses that concerns his offense or related offenses."); *United States v. Wrenn*, 66 F.3d 1, 3 (1st Cir. 1995) (information obtained from recordings of defendant's conversations with an undercover agent not "provided" by defendant within the meaning of § 5C1.2(5)); *United States v. Ivester*, 75 F.3d 182, 185 (4th Cir. 1996) (defendants must act affirmatively "to ensure that the Government is truthfully provided with all information and evidence the defendants have concerning the relevant crimes.").

In finding that Defendant qualified for the safety valve, the district court indicated that "the statute of limitations has run on his sons, whether they participated or not. He says they didn't. Unless you can prove otherwise, you're stuck with his

*determination by the court that the defendant has complied with this requirement.*

18 U.S.C. § 3553(f) (emphasis added). Shortly after adoption of this provision, the United States Sentencing Commission promulgated a new guideline, USSG § 5C1.2, which adopted the safety valve language verbatim.

Application of the safety valve provision not only requires a defendant to admit the conduct charged, but it also imposes an affirmative obligation on the defendant to "volunteer any information aside from the conduct comprising the elements of the offense." *United States v. Arrington*, 73 F.3d 144, 149 (7th Cir. 1996). Unlike other reduction provisions such as USSG § 3E1.1 (acceptance of responsibility), the provisions of USSG § 5C1.2 and 18 U.S.C. § 3553(f) require a defendant to "reveal a broader scope of information about the relevant criminal condut to the authorities." *United States v. Sabir*, 117 F.3d 750, 753 (3d Cir. 1997). These stringent requirements reflect the fact that the safety valve "was intended to benefit only those defendants who truly cooperate." *United States v. Martin*, 144 F.3d 1085, 1094 (7th Cir. 1998), *cert. denied*, 119 S. Ct. 265 (1998). Appellate courts have held that a defendant seeking to avoid a mandatory minimum sentence by resort to the safety valve has the burden of proving that he meets all of the criteria of the safety valve provisions. *See United States v. Conde*, 178 F.3d 616, 620 (2d Cir. 1999); *United States v. Hoskins*, 173 F.3d 351, 357 (6th Cir. 1999).

The government contends that Defendant did not exhibit such cooperation in the case at bar and, therefore, failed to satisfy the fifth criterion for application of the safety valve. Defendant avers that he did offer to cooperate in the investigation and prosecution of others, but the government refused to accept his cooperation. But we believe that he demonstrated a lack of cooperation by failing to discuss in detail the extent of his marijuana smuggling and growing operation. The information Defendant provided related to a supplier of growing lights, fertilizer, and other items which

speedy trial claim.[5] But nowhere in either of Defendant's briefs does he detail any "anxiety and concern" from which he may have suffered. But even assuming that Defendant suffered some anxiety, such a claim would be undermined by the fact that he greatly contributed to his own anxiety by virtue of his incessant appeals and motions.

### C.

We conclude that a balancing of the four *Barker* factors weighs against dismissal of the indictment. Although the lengthy delay in this case is presumptively prejudicial, other factors, including the extent to which Defendant asserted his speedy trial rights, the lack of prejudice to Defendant, and the reasons for delay--both as to the government's and

---

[5] The *Doggett* Court stated:

We have observed in prior cases that unreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including "oppressive pretrial incarceration," "anxiety and concern of the accused," and "the possibility that the [accused's] defense will be impaired" by dimming memories and loss of exculpatory evidence

. . .

consideration of prejudice is not limited to the specifically demonstrable, and . . . affirmative proof of particularized prejudice is not essential to every speedy trial claim. *Barker* explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown." And though time can tilt the case against either side . . . one cannot generally be sure which of them it has prejudiced more severely. Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, . . . it is part of the mix of relevant facts, and its importance increases with the length of delay.

*Doggett*, 505 U.S. at 655-56 (citations omitted) (footnote omitted).

Defendant's interlocutory appeals--support the district court's finding that Defendant's right to a speedy trial was not violated. Thus, we affirm the district court's holding denying Defendant relief under the Sixth Amendment's speedy trial provision.

## II.  Case No. 99-6153:  DEFENDANT'S SENTENCE

In its first appeal, the government contends that the district court erred in finding that Defendant established  eligibility for the "safety valve" provisions of 18 U.S.C. § 3553(f) and, in the alternative, that even under the safety valve provisions, his sentence of eighteen months imprisonment fell below the statutorily prescribed sentence.  Because Defendant failed to demonstrate sufficient cooperation, we find that application of the safety valve was improper.  Thus, we need not further address the legality of Defendant's eighteen month sentence.

### A.

Whereas this Court reviews a district court's interpretation of a statute or guideline provision *de novo*, we review a district court's factual determination of whether a statute or guideline applies in a particular case under a clearly erroneous standard.  *See United States v. Adu*, 82 F.3d 119, 124 (6th Cir. 1996); *United States v. Maduka*, 104 F.3d 891, 894 (6th Cir. 1997) (applying a *de novo* standard of review to the district court's interpretation of United States Sentencing Commission, *Guidelines Manual* § 5C1.2 (Nov. 1998)).

### B.

The Controlled Substances Act, 21 U.S.C. § 801  *et seq*., sets mandatory minimum sentences for major drug trafficking offenses.  Originally, the only way a defendant could reduce his sentence was to provide "substantial assistance in the investigation."  18 U.S.C. § 3553(e).  Ironically, this sentencing reduction provision tended to benefit those playing major roles in drug trafficking conspiracies because these individuals had the requisite knowledge to provide such substantial assistance.  Meanwhile, those with minor roles

who could not provide such detailed information were usually ineligible for the reduction.  In an effort to more equitably mete out justice to cooperating individuals playing minor roles in such conspiracies, Congress passed 18 U.S.C. § 3553(f)--the "safety valve" provision--as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322 § 80001.  That provision, entitled "Limitation on applicability of statutory minimums in certain cases," provides, in pertinent part:

> Notwithstanding any other provision of law, in the case of an offense . . . the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 *without regard to any statutory minimum sentence*, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that--
>
> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
>
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to any person;
>
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and
>
> (5) *not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a*