# IN THE COURT OF APPEALS OF TENNESSEE
## WESTERN SECTION AT NASHVILLE
_____

**FRANK RUDY HEIRS ASSOCIATES,**
**SHONEY'S INN OF MUSIC VALLEY, LTD.,**

    Plaintiffs-Appellees,

                                          Davidson Chancery No. 93-2957-II
Vs.                                 C.A. No. 01A01-9607-CH-00315

**SHOLODGE, INC.,**

    Defendant-Appellant.
_____

## FROM THE DAVIDSON COUNTY CHANCERY COURT
### THE HONORABLE ELLEN HOBBS LYLE, CHANCELLOR

Charles Patrick Flynn, Gerald D. Neenam of Nashville
For Plaintiffs-Appellees

Eugene N. Bulso, Jr. of Boult, Cummings, Conners & Berry, PLC
of Nashville, for Defendant-Appellant

*REVERSED AND REMANDED*

Opinion filed:



**FILED**

**March 12, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

                                   **W. FRANK CRAWFORD,**
                                   **PRESIDING JUDGE, W.S.**

**CONCUR:**

**DAVID R. FARMER, JUDGE**

**BEN H. CANTRELL, JUDGE**

This appeal basically involves the interpretation of a contract. Defendant, Sholodge, Inc., appeals from the order of the trial court granting partial summary judgment to the plaintiff, Shoney's Inn Of Music Valley, Ltd. The trial court ruled that Sholodge breached its Limited Partnership Agreement with Frank Rudy Heirs Associates, and, therefore, granted partial summary judgment to Shoney's Inn of Music Valley, Ltd. (Partnership). The trial court referred the issue of damages to a Special Master. The trial court confirmed the report of the Special Master and awarded damages of $3,045,031.00 to the Partnership. The order was made final pursuant to Tenn.R.Civ.P. 54.02 and Sholodge has appealed.

Frank Rudy Heirs Associates filed this lawsuit for itself and on behalf of the Partnership.[1]

The material facts are not in dispute. Another cause of action set out in the complaint was before this Court previously, and the basic background facts are succinctly stated in *Frank Rudy Heirs Assocs. v. Moore & Assocs.,* 919 S.W.2d 609 (Tenn. App. 1995) which we quote:

> Four members of the Rudy family inherited a piece of land on Music Valley Drive in Nashville, a popular tourist area. In 1986, Gulf Coast Development, Inc. (GCD), an owner and operator of Shoney's Inns, proposed to buy the property and erect a hotel on it. The heirs did not want to give up the property, and so the parties entered into a limited partnership agreement by which GCD was able to build a Shoney's Inn on the property, and the Rudy heirs acquired a 40% interest in the proposed hotel enterprise, as well as a $40,000 a year ground lease agreement for the use of the land.
>
> Gulf Coast Development became the general partner, and retained a 60% interest. The partnership was called Shoney's Inn of Opryland, Ltd. The name was later changed to Shoney's Inn of Music Valley, Ltd., and GCD later became Sholodge, Inc. The August 4, 1986 partnership agreement recited that its execution coincided with the activation of a management agreement between the partnership and the general partner, whereby the general partner would receive a fee of 6% of revenues for managing the affairs of Shoney's Inn of Opryland.

919 S.W.2d at 610.

In the Limited Partnership Agreement, Sholodge and Rudy Heirs were allowed to compete with the Partnership, but Sholodge could not acquire an "ownership interest" in another

---

[1]The complaint sues Moore & Associates, Inc., Leon Moore, and Sholodge, Inc. for breach of fiduciary duty, breach of contract, fraudulent concealment, constructive fraud, reckless or intentional misrepresentation in a business transaction, tortious inference with a contractual relationship, conspiracy, and also seeks an accounting. This appeal involves only an action for breach of contract.

2

hotel. The Limited Partnership Agreement provides in pertinent part:

> 5.7    Independent Activities.
>         The General Partner and the Limited Partners may, notwithstanding the existence of this Agreement, engage in whatever activities they choose, whether or not such activities be the same as, similar to, or competitive with the business of the Partnership, without having or incurring any obligation to account to the Partnership in connection therewith or to offer any interest in such activities to the Partnership or any party hereto, and, as a material part of the consideration for the General Partner's execution hereof and for the admission of the Limited Partners, the Limited Partners hereby waive, relinquish and renounce any such right or claim of participation.  Notwithstanding the foregoing, the General Partner hereby agrees that during the term hereof it will not acquire an ownership interest in a motor hotel facility within one (1) mile of the Inn or within one quarter (1/4) mile on either side of Briley Parkway from McGavock Pike to Lebanon Pike without first offering such interest to the Partnership.

On July 10, 1989, Sholodge entered into a hotel development agreement with Prime Motor Inns, Inc.[2] (Prime).  Sholodge and Prime agreed to develop at least 10 AmeriSuites hotels in the first year of the agreement, and then 10 AmeriSuites hotels per year each year until 1994. Sholodge identified possible sites for the AmeriSuites and submitted development proposals to Prime.  If the potential site was acceptable to Prime, Sholodge negotiated a purchase agreement and then acted as an independent contractor for construction of the hotel.  Finally, Sholodge managed the hotel after completion.  Prime was responsible for financing at all stages of development.

Sholodge located an acceptable site for an AmeriSuites hotel in Nashville in accordance with the hotel development agreement with Prime.  The site was located next to the Shoney's Inn owned by the Partnership.

Prime did not want to hold the title to the site during construction for accounting reasons. Therefore, Sholodge formed a new corporation, SuiteEquity, for the purpose of holding title to the property where the AmeriSuites hotel was built.  SuiteEquity was capitalized with $1,000.00 in cash, the minimum permitted in Tennessee.  Prime loaned SuiteEquity the amount of the purchase price to acquire the property.  SuiteEquity purchased the real estate and began

---

[2] The development agreement was executed by Howard Johnson Development V, Inc., a wholly owned subsidiary of Prime.

construction.[3] Also with funds provide by Prime, the AmeriSuites hotel opened for business on July 13, 1990. After the opening, SuiteEquity conveyed the property to Prime in return for forgiveness of the loan for the purchase price and construction. Sholodge managed the hotel after it opened. Sholodge did not offer any part of this opportunity to the Partnership.

Rudy Heirs initially filed a complaint against Sholodge in the Chancery Court for Sumner County.[4] Though it is not entirely clear from the record, it appears from the briefs and oral argument that the complaint in that case alleged virtually the same causes of actions as the complaint in the case before us. During the course of the jury trial, the chancellor, in ruling on a motion in limine on October 7, 1993, stated from the bench that he was of the opinion that Sholodge "did not acquire an ownership interest in a motor hotel facility within one mile of the Inn or within one quarter of a mile on either side of Briley Parkway from McGavock Pike to Lebanon Pike." No written order was entered on this ruling and subsequently on October 11, 1993, Rudy Heirs took a voluntary nonsuit.

On March 11, 1994, Rudy Heirs refiled the complaint in the Chancery Court for Davidson County. Rudy Heirs again alleged, *inter alia*, that Sholodge had an ownership interest in the AmeriSuites within one mile of the Shoney's Inn in violation of paragraph 5.7 of the Limited Partnership Agreement.[5] Sholodge denied the material allegations of the complaint. Both Sholodge and Rudy Heirs filed motions for summary judgment on the various counts.

The trial court granted partial summary judgment to Rudy Heirs on the question of breach of the Limited Partnership Agreement, and found that "Sholodge, Inc. violated paragraph 5.7 of the Limited Partnership Agreement, and that the Partnership is entitled to recover from Sholodge, Inc. damages for the said breach." The trial court then referred the issue of damages to a Special Master for determination.

_____

[3] Moore & Associates, Inc., a subsidiary of Sholodge, actually constructed the AmeriSuites.

[4] The complaint was filed against Moore & Associates, Inc., Leon Moore, and Gulf Coast Development, Inc. Gulf Coast is the predecessor of Sholodge. Rudy Heirs filed the complaint for itself and on behalf of the Partnership.

[5] Rudy Heirs also demanded a complete accounting, and it alleged breach of fiduciary duty, fraudulent concealment, constructive fraud, reckless or intentional misrepresentation in a business transaction, tortious interference with a contractual relationship, and conspiracy. These causes of action are not before the Court in this appeal.

A hearing was held before the Special Master on August 3, 1995. The Special Master issued a report to the trial court on November 8, 1995. The Special Master found that Sholodge owed the Partnership $3,045,031.00 as a result of the development and management agreements between Sholodge and Prime. Sholodge objected to the Special Master's report on November 20, 1995. On December 27, 1995, the trial court overruled Prime's objection, approved and confirmed the Special Master's report, and awarded a judgment to the Partnership in the amount of $3,045,031.00. By agreed order entered March 14, 1996, the trial court declared that the portion of the December 27, 1995 order concerning the breach of paragraph 5.7 of the Agreement was final pursuant to Tenn. R. Civ. P. 54.02.

Sholodge has appealed and presents the following issues for our review: 1) whether the Chancery Court for Sumner County's ruling that Sholodge did not breach paragraph 5.7 of the Limited Partnership Agreement precludes that claim in this action; 2) whether Sholodge's development and management of an AmeriSuites Hotel in Nashville violated paragraph 5.7 of the Limited Partnership Agreement; and 3) whether the trial court's confirmation of the Special Master's report should be set aside.

In the first issue, Sholodge asserts that Rudy Heirs is precluded from raising the same claim that was dismissed in the original suit in the Chancery Court for Sumner County. In the first suit, the chancellor stated, as a matter of law, that Sholodge did not acquire an ownership interest in a motor hotel facility in violation of paragraph 5.7 of the Limited Partnership Agreement. The chancellor made this ruling from the bench, but did not enter a written order. Rudy Heirs then nonsuited the case which was dismissed without prejudice.

Sholodge asserts that *Patterson v. Ridenour*, 263 S.W.2d 537 (Tenn. 1953), controls this dispute, and that under *Ridenour* the statement of the chancellor from the bench should be sufficient to invoke the doctrine of *res judicata*. We do not find it necessary to address this assertion, because *Ridenour* was decided prior to the adoption of Tennessee Rules of Civil Procedure, and we believe the case before us is controlled by the present rules. It is undisputed that the case on trial in the Sumner County Chancery Court involved multiple claims, and it is also undisputed that the chancellor's bench ruling pertained to only one claim in litigation. Even assuming that we could consider the chancellor's oral ruling as a valid order, the parties are still

5

left with an interlocutory order subject to revision at any time prior to "entry of the judgment adjudicating all the claims and the rights and liabilities of all the parties." Tenn.R.Civ.P. 54.02.

Obviously in the case before us there has been no compliance with Tenn.R.Civ.P. 58 pertaining to entry of final judgment, nor under any stretch of the imagination has there been any compliance with the provisions of Tenn.R.Civ.P. 54.02 for making an interlocutory order a final order and appealable as of right. *See Fox v. Fox*, 657 S.W.2d 747 (Tenn. 1983)(holding that there must be certification by the trial judge that there is no just reason for delay and that the court has directed the entry of a final judgment). Even if we could give the chancellor's oral pronouncement from the bench the dignity of an order, it would be only an interlocutory order and, for *res judicata* or collateral estoppel to apply, the judgment in the prior case must have been final. *See Richardson v. Tennessee Bd. of Dentistry*, 913 S.W.2d 446 (Tenn. 1995). A voluntary nonsuit is not an adjudication of "all the claims and the rights and liabilities of all the parties." Tenn.R.Civ.P. 54.02. Thus, upon dismissal, any interlocutory orders are merely part of the proceedings dismissed and have no binding effect. This issue is without merit.

In the second issue, Sholodge argues that it did not violate paragraph 5.7 of the Limited Partnership Agreement because it did not acquire an ownership interest in the AmeriSuites near the Shoney's Inn.

A trial court should grant a motion for summary judgment when the movant demonstrates that there are no genuine issues of material fact, and that the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.03. The phrase "genuine issue" as stated in Rule 56.03 refers to genuine factual issues, and does not include issues involving legal conclusions to be drawn from the facts. *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). A motion for summary judgment can provide a quick and inexpensive means to dispose of cases where only legal questions and not material facts are at issue. *Brookins v. The Round Table, Inc.*, 624 S.W.2d 547, 550 (Tenn. 1981); *Ferguson v. Tomerlin*, 656 S.W.2d 378, 382 (Tenn. App. 1983). Our review is de novo on the record with no presumption of the correctness of the trial court's conclusions of law. *Union Planters Nat'l Bank v. American Home Assurance Co.*,

865 S.W.2d 907, 912 (Tenn. App. 1993).

The interpretation of a written agreement is a matter of law and not of fact. *Rainey v. Stansell*, 836 S.W.2d 117, 118 (Tenn. App. 1992). In *Rainey*, this Court discussed the rules for the interpretation of contracts:

> The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention consistent with legal principles. A primary objective in the construction of a contract is to discover the intention of the parties from a consideration of the whole contract. In construing contracts, the words expressing the parties' intentions should be given their usual, natural and ordinary meaning, and neither party is to be favored in the construction. The court, in arriving at the intention of the parties to a contract, does not attempt to ascertain the parties' state of mind at the time the contract was executed, but rather their intentions as actually embodied and expressed in the contract as written. All provisions of a contract should be construed as in harmony with each other, if such construction can be reasonably made, so as to avoid repugnancy between the several provisions of a single contract.

*Rainey*, 836 S.W.2d at 118-119 (citations omitted).

Where there is no ambiguity, it is the duty of the court to apply to the words used their ordinary meaning. *Winfree v. Educators Credit Union*, 900 S.W.2d 285, 289 (Tenn. App. 1995). In the absence of fraud or mistake, a contract must be interpreted and enforced as written even though it contains terms which may be thought harsh and unjust. *Allstate Ins. Co. v. Wilson*, 856 S.W.2d 706, 708 (Tenn. App. 1992). Although a contract cannot be varied by oral evidence, the course of previous dealings, the circumstances in which the contract was made, and the situation of the parties are matters properly to be looked to by the court in arriving at the intention of the parties to the contract. *Wilkerson v. Williams*, 667 S.W.2d 72 (Tenn. App. 1983).

In Paragraph 5.7 of the Limited Partnership Agreement between Rudy Heirs and Sholodge, Sholodge agreed not to "acquire an ownership interest in a motor hotel facility within one (1) mile of the Inn . . . without first offering such interest to the Partnership." Therefore, we must determine from the four corners of the Limited Partnership Agreement what the parties intended "ownership interest" to mean and whether the Sholodge agreement with Prime establishes such an interest.

7

The pertinent agreement between Sholodge and Prime is titled "Hotel Development Agreement," and is between Prime, designated as owner and Sholodge, designated as developer.[6] The preamble to the agreement states the purpose as follows:

**PREAMBLE**

The purpose of this Agreement is to set forth the terms and conditions for the development of hotels of the style defined as "Howard Johnson AmeriSuites" and other Howard Johnson hotel facilities by Owner and Developer. The Developer will be responsible for the location of desirable sites; the development of plans, specifications and construction budgets; and the construction, equipping, staffing, and opening of "turn-key hotels" ("Hotel Development"). In this Agreement hotels shall be understood to include all their components such as land, buildings, furniture, fixtures, equipment and other items ("Hotel" or "Hotels"). The Owner will be responsible for financing Hotel Developments in accordance with this Agreement.

The part of the agreement pertinent to the controversy before us provides:

ARTICLE 6

HOTEL OPERATIONS; DEVELOPER'S PROFIT PARTICIPATION

\*           \*           \*

6.5 Developer's Profit Participation in Cash Flow. The Developer shall be entitled to a Profit Participation in the

net profits from operations equal to twenty-five (25%) percent of Net Cash Flow. Net Cash Flow will be determined on a fiscal year basis ending June 30th. On or before August 31 of each fiscal year the Owner will submit to the Developer a statement of operations certified to by the Owner's chief financial officer setting forth the Gross Revenues, the Expenses, the Net Cash Flow, and the amount of Profit Participation, if any, to which the Developer is entitled, together with payment of such Profit Participation for the fiscal year reported upon.

6.6  Distribution of Proceeds on Sale and Refinancing.

A.      The Developer shall be entitled to a Profit Participation of the net proceeds on sales and refinancings in accordance with this Section 6.6.

B.      The proceeds of any Sale, including all cash receipts, assets and/or property received, arising from or in connection with a Sale of any Hotel, will be distributed as follows:

---

[6]The agreement is actually in the names of the respective companies prior to the name changes. For clarity, we have used the present names of the companies.

(a) To pay all expenses of the sale;

(b) To pay principal and interest on the First Mortgage Financing;

(c) To pay principal and interest on the Owner's Investment;

(d) To pay all other Expenses to the extent there is insufficient cash flow from operations (including principal and interest on the Working Capital Fund and the Operating Advances);

The balance (the "Net Sale Proceeds") shall be paid seventy-five (75%) percent to Owner and twenty-five (25%) percent to Developer.

C. The proceeds of any Refinancing including all cash receipts, assets and/or property received, arising from or in connection with a Refinancing of any Hotel, will be distributed as follows:

(a) To pay all expenses of the Refinancing;

(b) To pay principal and interest on the First Mortgage Financing;

(c) To pay principal and interest on Owner's Investment;

(d) to pay principal and interest on the Working Capital Fund and Operating Advances;

The Balance (the "Net Refinancing Proceeds") will be paid seventy-five (75%) percent to Owner and twenty-five (25%) percent to Developer.

*          *          *

Rudy Heirs asserts that the profit participation provision in the development agreement constitutes an "ownership interest" as contemplated by the Limited Partnership Agreement. They argue that an ownership interest is recognized in a later option agreement between Prime and Sholodge whereby Sholodge is given the right to terminate its "right, title, and interest in any and all of the Profit Participation in any one or more of the Participation Hotels."

Sholodge, on the other hand, asserts that the Profit Participation provided in the development agreement is merely agreed compensation to Sholodge for its performance of the duties and obligations imposed upon it by virtue of the development agreement.

The Limited Partnership Agreement recognizes the right of both Rudy Heirs and

9

Sholodge to compete with the limited partnership. The extent of the allowed competition is quite expansive: "The General Partner and the Limited Partners may . . . engage in whatever activities they choose, whether or not such activities be the same as, similar to, or competitive with the business of the Partnership . . . ." The only limitation on this provision is quite explicit: Sholodge agrees that "it will not acquire an ownership interest in a motor hotel facility within one (1) mile of the Inn . . . ." Considering the wide-open competition allowed, with the one limiting restriction, "ownership interest," we conclude that the parties intended "ownership interest" to be used and understood in a narrow sense. We find no ambiguity in this paragraph of the Limited Partnership Agreement, and if Rudy Heirs had not intended for "ownership interest" to have a very limited meaning, it could have restricted Sholodge from developing, managing, or building any type of motor hotel facility within the territory described in the paragraph.

The term "ownership" has been "given a wide range of meanings, but is often said to comprehend both the concept of **possession** and, further, that of **title** and thus be broader than either." Barron's Law Dictionary 339 (3d ed. 1991) (emphasis in original). Black's Law Dictionary defines "own" as "to have a good legal title; to hold as property; to have a legal or rightful title to; to have; to possess."Black's Law Dictionary 996 (5th ed. 1979). The ordinary and usual meaning of ownership is "possession" or "legal title." The technical meaning of owner is "title holder." In *Union Carbide Corp. v. Alexander*, 679 S.W.2d 938 (Tenn. 1984), the Supreme Court, in considering the question of whether a corporation was the owner of real property subject to property tax, stated:

> In a property assessment manual (International Association of Assessing Officers, *Property Assessment Valuation* (1977)), it is said that there are six basic rights associated with the ownership of property: (1) the right to use; (2) the right to sell; (3) the right to lease or rent; (4) the right to enter or leave; (5) the right to give away; (6) the right to refuse to do any of these.

679 S.W.2d at 940.

In the case before us, Sholodge, by virtue of its management of the hotel, had the right to use and the right enter or leave the premises. Union Carbide had the same right, but our Supreme Court stated:

10

> As the Court of Appeals pointed out, the right to alienate is an important element of ownership. *See* 63 Am.Jur.2d *Property* § 47 (1972), at 331. Carbide has no interest under the contract that it can sell, lease, or otherwise transfer. The mere use by Carbide of the real property for purposes of performing the contract does not amount to an incident of ownership.

679 S.W.2d at 941. In the instant case, Sholodge could not alienate the property nor could it prevent Prime from doing so.

Rudy Heirs's assertion essentially is that because Sholodge has a property interest in the profit participation, it has an ownership interest in the hotel, as contemplated by the Limited Partnership Agreement. As we previously noted, our interpretation of Paragraph 5.7 of the Limited Partnership Agreement is that "ownership interest" is to be considered in a very narrow sense in view of the language of the entire paragraph. It is significant that Sholodge had no risk of loss except the loss of anticipated revenue to be paid for its services. If the net cash flow of the AmerSuites was negative, Sholodge was not responsible for any shortfall, although it would certainly not be entitled to any revenue. If the hotel was sold at a loss, Sholodge would not suffer any part of the loss, except its loss of the revenue. Finally, Rudy Heirs points to Sholodge's exercise of the option to receive a lump sum payment in lieu of continued percentage of profits. The fact that Sholodge negotiated what it thought was a more favorable compensation plan does not automatically convert Sholodge from developer and manager to an owner. We attach little significance to this turn of events.

Considering this record and the contract between the parties hereto in its entirety, we reach the conclusion that Sholodge did not hold an "ownership interest" in a motor hotel facility within one mile of the Shoney's Inn owned by the Partnership.

Accordingly, the order of the trial court granting summary judgment to Rudy Heirs is reversed, and the case is remanded to the trial court for entry of summary judgment in favor of Sholodge and for such further proceedings as may be necessary. The other issues are pretermitted. Costs of the appeal are assessed against appellee.

_____
**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

11

_____
**DAVID R. FARMER, JUDGE**


_____
**BEN H. CANTRELL, JUDGE**