IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 4, 2004 Session

## DAVID FROUNFELKER v. IDENTITY GROUP, INC.

**Appeal from the Chancery Court for Putnam County**
**No. 2001-141     Vernon Neal, Chancellor**

_____

**No. M2003-03112-COA-R3-CV - Filed April 21, 2005**

_____

This is a breach of contract case in which the controlling issue involves the commencement and conclusion of the term of an employment contract and, more specifically, when Plaintiff's guaranteed term of employment ended. The trial court determined that Defendant had breached the contract by terminating Plaintiff prior to the end of his employment term and awarded damages, together with contract authorized attorney fees and expenses. We affirm the judgment of the Chancellor.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and HERSCHEL P. FRANKS, P.J., joined.

Jeffrey Glenn Jones, Cookeville, Tennessee; Patrick K. Cavanaugh, Pittsburgh, Pennsylvania, for the appellant, Identity Group, Inc.

Cynthia A. Wilson, Jon Edward Jones, Cookeville, Tennessee, for the appellee, David Frounfelker.

**OPINION**

Prior to the contractual arrangements in issue in this case, Plaintiff, David Frounfelker, and Defendant, Identity Group, Inc., were business competitors located in Cookeville, Tennessee. Frounfelker owned and operated D.L. Technologies, Inc., which competed directly with the Porelon/Microfoam Division of Identity Group. Identity Group determined to buy the assets of D.L. Technologies, Inc. and employ Frounfelker as president of its Porelon Division. Negotiations between the parties culminated in the execution of an Asset Purchase Agreement on March 15, 2000, whereby D.L. Technologies, Inc. agreed to convey all of its assets to Identity Group, Inc., with Frounfelker joining individually because of certain personal covenants contained in the Asset Purchase Agreement. In its introductory clauses, this Asset Purchase Agreement provided:

WHEREAS, Seller is engaged in the business of manufacturing and selling ink roll products (the "Business"):

WHEREAS, Buyer desires to acquire, and Seller desires to sell, all of the assets of Seller used in connection with the Business (the "Asset Acquisition");

WHEREAS, substantially simultaneously with the consummation of the Asset Acquisition, Buyer and Frounfelker will enter into an employment agreement in substantially the form of Exhibit A attached hereto;

WHEREAS, substantially simultaneously with the consummation of the Asset Acquisition, Buyer and Frounfelker will enter into a stock appreciation right agreement; and

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereby agree as follows:

The Asset Purchase Agreement went on to provide:

1.02 Closing. The closing of the transactions contemplated herein (the "Closing") shall take place on March 31, 2000 or such other date as the parties mutually agree (the "ClosingDate"), at 10:00 a.m., local time, at such place as the parties mutually agree.

Attached as Exhibit A to the Asset Purchase Agreement was the Employment Agreement between Identity Group, Inc. and David Frounfelker beginning with the phrase: "THIS AGREEMENT, made as of March _____, 2000." The original of this Exhibit A, Employment Agreement, was executed simultaneously with the Asset Purchase Agreement, with the first line of the Employment Agreement providing "THIS AGREEMENT, made as of March _15_, 2000." A second additional agreement described in the Asset Purchase Agreement was also to be entered into "substantially simultaneously with the consummation of the Asset Acquisition," and was referred to as a Stock Appreciation Right Agreement between David Frounfelker and Identity Group, Inc. This Stock Appreciation Right Agreement was dated March 31, 2000.

As contemplated in the Asset Purchase Agreement, the transaction between and among the parties closed on March 31, 2000, and David Frounfelker went to work for Identity Group, Inc. on April 1, 2000, as president of its Porelon/Microfoam Division.

All seemed well on the surface until paragraph 1.02 of the Employment Agreement was considered in isolation and without regard to the Asset Purchase Agreement. Paragraph 1.02 of the Employment Agreement provides:

1.02. <u>Term</u>. Subject to the terms and provisions of Article II hereof, Executive's employment hereunder shall commence on the date hereof (the "Commencement Date") and shall continue thereafter until the twelve month anniversary of the Commencement Date unless sooner terminated pursuant to Article II hereof or unless renewed or extended by mutual written consent of the Company and the Executive.

When paragraph 1.02 of the Employment Agreement is considered in reference to the Employment Agreement alone and not in conjunction with the Asset Purchase Agreement, it would appear that the term of employment of Frounfelker by Identity Group, Inc. commenced as of March 15, 2000, and terminated on March 15, 2001. This is the issue that controls the outcome of this case.

Frounfelker insists that when the Asset Purchase Agreement, the Employment Agreement, and the Stock Appreciation Right Agreement are considered together, it is clear that the initial term of his employment with Identity Group, Inc. was from April 1, 2000, to April 1, 2001. Identity Group, Inc. insists that the Employment Agreement alone controls and that when paragraph 1.02 of the Employment Agreement is applied to its opening paragraph providing "THIS AGREEMENT, made as of March *15*, 2000," the meaning is clear and unambiguous and needs no construction; thus, parol evidence is inadmissable to establish the term of employment to be anything other than March 15, 2000, to March 15, 2001.

The Chancellor, in an extensive Memorandum Opinion, determined all issues in favor of David Frounfelker holding:

This is an action on an employment contract dated March 15, 2000. The plaintiff contends that defendant breached the agreement and that he is entitled to receive benefits under the terms and provisions of the employment agreement which the defendant denies and has refused to pay. For the reasons herein stated, the Court finds that the defendant has breached the employment agreement and that the plaintiff is entitled to recover certain benefits from the defendant as hereafter shown.

Identity Group, Inc., (Identity Group) owns a processing and distribution center located in Cookeville, Tennessee. Prior to March 15, 2000, David Frounfelker owned and operated D.L. Technologies, Inc., a business similar to that operated by Porelon, a division of Identity Group. On March 15, 2000, the parties hereto entered into an asset purchase agreement whereby D.L. Technologies and David Frounfelker would sell and Identity Group would buy all the assets of plaintiff's business.

The asset purchase agreement refers to an employment agreement made an exhibit thereto and provided that plaintiff would be employed by defendant for an initial twelve (12) month period as president of Porelon/Microfoam division of the company at a base salary of $125,000 for the twelve (12) month period in addition to other benefits therein mentioned. The asset purchase agreement also provided for

a stock appreciation right agreement and contained a provision that both the employment agreement and the stock appreciation agreement would be entered into substantially simultaneously with the consummation of the asset acquisition. The asset acquisition was consummated on March 31, 2000, and the stock appreciation right agreement was dated on that date.

Although the employment agreement provides that plaintiff's employment shall commence to [sic] the date of the agreement (March 15, 2000) and shall continue thereafter until the twelve month anniversary from the date thereof, unless sooner terminated, it is uncontroverted that his actual employment did not begin until April 1, 2000. The plaintiff contends that the commencement date of the employment agreement was April 1, 2000, while the defendant contends that the commencement date was March 15, 2000. Thus, the first issue to be determined by the Court is whether the commencement date of the twelve (12) month employment period mentioned in the agreement commenced on March 15, 2000, or April 1, 2000.

The cardinal rule of contract interpretation is that the Court must attempt to ascertain and give effect to the intention of the parties. See *Simonton v. Huff*, 60 S.W.3d 820 (Tenn. App. 2000); *Winfree v. Educations Credit Union*, 900 S.W.2d 285, 298 (Tenn. Ct. App. 1995); *Breeding v. Shackelford*, 888 S.W.2d 770, 775 (Tenn. Ct. App. 1994). In attempting to ascertain the intention of the parties, the Court must examine the language of the contract giving each word its usual, natural and ordinary meaning. See *Simonton v. Huff*, 60 S.W.3d at 825; *Wilson v. Moore*, 929 S.W.2d 367,373 (Tenn. Ct. App. 1996). The Court may also consider the situation of the parties, the business to which the contract relates, the subject matter of the contract, the circumstances surrounding the transaction, and the construction placed on the contract by the parties in carrying out its terms. See *Simonton v. Huff*, 60 S.W.3d at 825; *Penske Truck Leasing Co., L.P. v. Huddleston*, 794 S.W.2d 669, 671 (Tenn. 1990). In the absence of fraud or mistake, the Court should construe contracts as written. See *Marshall v. Jackson, et al*, 20 S.W.3d 678 (Tenn. App. 1999); *Frank Rudy Heirs Assocs. v. Sholodge, Inc.*, 967 S.W.2d 810, 814 (Tenn. Ct. App. 1997); *Whaley v. Underwood*, 922 S.W.2d 110, 112 (Tenn. Ct. App. 1995).

The terms of separate contracts which form integral parts of a single transaction may be considered together. See *Realty Shop, Inc., v. R.R. Westminster Holding*, 70 S.W.3d 581, 599 (Tenn. Ct. App. 1999); *McCall v. Towne Square, Inc.*, 503 S.W.2d 180, 182-83 (Tenn. 1973); *Stovall v. Dattel*, 619 S.W.2d 125, 127 (Tenn. Ct. App. 1981).

In the instant case, the asset purchase agreement, the employment agreement and the stock appreciation right agreement may all be considered together as they form integral parts of a single transaction. This is based on the clear language and intent of the asset purchase agreement. This conclusion is further bolstered by the

deposition testimony of Art Dilling, former CEO of Identity Group, who said that the parties hereto could not do one of the agreements without the other.

The overwhelming weight of the evidence in this case indicates that it was the intent of the parties to the employment agreement that the effective or commencement date of plaintiff's employment with the defendant would not commence until after the closing of the asset purchase agreement which was closed on March 31, 2000, and that his twelve month employment would and did commence on April 1, 2000. Art Dilling, a former CEO of Identity Group, testified by deposition that it was the intent of the parties that Frounfelker was to be president of Porelon from April 1, 2000, until April 1, 2001. He further admitted that it appeared to him that the commencement date of the employment agreement was when Mr. Frounfelker began work, that being April 1, 2000. Donald Polak, who was CEO of the Identity Group at the time the employment agreement was executed and who either drafted or had the agreement drafted, testified that his intent was that Mr. Frounfelker would work for twelve months. The plaintiff also testified that his contract of employment began on April 1, 2000.

In addition to the oral testimony, the documentary evidence introduced at trial indicate that the parties intended for plaintiff's contract of employment to commence on April 1, 2000. The asset purchase agreement states and provides that the employment agreement will be entered into when the asset acquisition is consummated or completed and provides as follows:

> WHEREAS, substantially simultaneously with the *consummation* of the Asset Acquisition, buyer and Frounfelker will enter into an employment agreement in substantially the form of exhibit A attached hereto.

The natural and ordinary meaning of the term "consummate" is "to finish by completing what was intended; bring or carry to upmost point or degree; carry or bring to completion." See *State of Tennessee v. Legg*, 9 S.W.3d 111 (Tenn. Ct. App. 1999) citing *Black's Law Dictionary* 317 (6th ed. 1990).

Not only did the asset purchase agreement provide that the asset acquisition will be consummated and closed on March 31, 2000, unless the parties agree to a different date, it bound Frounfelker to continue to operate the business which Identity Group was purchasing from him in the ordinary course to and including the closing date. (See Article 5.03 and Article VIII of the Asset Purchase Agreement). The import of the provisions in the asset purchase agreement is to the effect that plaintiff could not have commenced his employment as president of Porelon prior to April 1, 2000, without being in violation or breach of the provisions of the asset purchase

agreement. It is uncontroverted that the bill of sale and closing of the asset purchase agreement occurred on March 31, 2000.

Identity Group's enrollment form for plaintiff's medical and dental benefits indicate that the same would become effective on April 1, 2000. After the plaintiff was terminated from his employment, the employer prepared an insurance form for COBRA notification showing that his original coverage date was April 1, 2000. The stock appreciation right agreement providing certain incentive compensation to plaintiff was dated March 31, 2000, the same date that the asset purchase agreement was closed and the day before Plaintiff began his employment. The employer's personnel file (Ex. 4) shows that Mr. Frounfelker's next review date remains April 1, 2001. Another portion of the employee records kept by defendant shows that the plaintiff's salary as president to be $125,000 per year effective April 3, 2000. The Court takes judicial notice of the fact that April 1, 2000, was a Saturday and that April 3, 2000, was a Monday. A letter of intent was signed by an authorized representative of Identity Group and David Frounfelker on January 20, 2000, setting out the terms and provisions of the employment agreement and further stating that it was anticipated being able to close the asset purchase agreement on March 31, 2000.

The plaintiff says that the employment contract should be reformed to make April 1, 2000, the commencement date of the agreement so as to set out the true intent of the parties in that the insertion of the commencement date of March 15, 2000, was a mutual mistake of the parties. The reformation of a contract is an equitable remedy applicable where there is a mutual mistake of the parties. See *Williams v. Botts*, 3 S.W.3d 508 (Tenn. Ct. App. 1999); *Cincinnati Ins. Co. v. Post*, 747 S.W.2d 777 (Tenn. 1988); *Pierce v. Flynn*, 656 S.W.2d 42 (Tenn. App. 1983).

In determining whether a mutual mistake exists for reformation purposes, the Court will take into consideration the surrounding circumstances and any factors which tend to shed light on the parties' intentions. *City of Memphis for use and benefit of State v. Moore*, 818 S.W.2d 13 (Tenn. Ct. App. 1991). A party seeking reformation must prove the grounds thereof by clear and convincing evidence. See *Russell v. Security Ins., Inc.,* 1999 Tenn. App. LEXIS 102 No. 01A01-9803-CV-00135; *Cincinnati Ins. Co. v. Post*, 747 S.W.2d 777 (Tenn. 1988). Where there has been a meeting of the minds as to a contract but the written instrument does not express what was really intended by the parties, the instrument may be reformed or conformed to the agreement according to the intention of the parties. *Cincinnati Ins. Co. v. Post*, 747 S.W.2d 777, supra; *Walker v. Walker*, 2 Tenn. App. 279 (1925).

The Court finds by clear and convincing evidence that the parties did not intend for the term of employment to begin until after the closure of the asset purchase agreement. Inasmuch as that agreement was closed on March 31, 2000, it

was the intent of the parties that the original twelve (12) month term of the employment would commence on April 1, 2000. The employment agreement should be and shall be reformed to make the commencement date of the employment agreement to be April 1, 2000. The contract date is immaterial inasmuch as the controlling issue is the commencement date of the term of employment.

The corporate officers of Identity Group have stated on their oath in this proceeding that it was the intent of the parties that plaintiff would be employed a full twelve (12) months after the closing date of the asset purchase agreement and the defendant is, therefore, judicially estopped from contending otherwise. See *Reed v. Alamo Rent-A-Car*, 4 S.W.3d 677 (Tenn. Ct. App. 1999).

The asset purchase agreement, of which the employment agreement is an integral part, provides that any provision of the agreement may be waived by the party benefitted by the provision. Even if it should be found that the commencement date was March 15, 2000, as opposed to April 1, 2000, the defendant waived the March 15, 2000, date by not commencing the employment on that date but instead commencing plaintiff's employment on April 1, 2000, and by requiring him to remain at the helm of D.L. Technologies until the asset purchase was closed on March 31, 2000. In *Baird v. Fidelity-Phenix Fire Ins. Co.*, 178 Tenn. 653, 162 S.W.2d at 384 (1942) our Supreme Court adopted the following definition of waiver:

> Waiver is a voluntary relinquishment or reunification of some right, a foregoing or giving up of some benefit or advantage, which, but for such waiver, he would have enjoyed. It may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was an intention and purpose to waive.

It has further been held that parol evidence is admissible to show a wavier [sic] of a contractual provision. *Gold Kist, Inc., v. Pillow*, 582 S.W.2d 77, 79 (Tenn. App. 1979), *Baird v. Fidelity-Phenix Fire Ins. Co., supra*.

The defendant argues and contends that even if the commencement date of the employment agreement was April 1, 2000, the same was mutually terminated by a document signed by the parties prior to March 15, 2000, purporting to extend all the terms and conditions embodied in the original agreement for seven (7) days until March 22, 2001.

At the time Rand Krikorian induced David Frounfelker to sign the purported extension agreement, Krikorian had not made an investigation to determine that Frounfelker's employment had actually began on April 1, 2000. He told plaintiff that

the employment agreement would terminate on March 15, 2000 [sic]. Frounfelker had previously taken and at trial took the position that his twelve (12) month employment term did not terminate until April 1, 2001. It appears that Krikorian convinced Frounfelker that the contract date was the commencement date of the employment agreement and that his employment would terminate on March 15, 2001. The plaintiff was told that he would not be employed after March 15, 2001, if he did not sign the extension agreement. The proof indicates that the defendant had considered terminating plaintiff at an earlier date. No evidence has been presented which would indicate that Frounfelker had previously been warned or written up for any type of inefficiency or misconduct. In fact, Ravi Venkataraman, a representative of and part owner of the defendant company, stated in deposition testimony that he was not aware of Frounfelker having ever done anything to justify his termination. Obviously, Frounfelker reasonably believed that he had a lot of economic benefits at stake in the employment agreement including salary, fringe benefits and the $100,000.00 bonus. The plaintiff was made to believe that time was of the absolute essence and that under the employment agreement he would no longer be employed after March 15th, 2001, if he did not sign the extension agreement.

The Court finds that Krikorian believed the purported extension agreement would negate defendant's obligation to pay the $100,000 bonus. From the evidence and the circumstances surrounding the signing of the purported extension agreement, the Court finds that Krikorian and the defendant had no intention of extending plaintiff's employment beyond March 22, 2001, and that agreement was nothing more than a ruse on the part of defendant who was ill advised into believing that agreement would nullify plaintiff's bonus. This finding is further evidenced by the fact that Frounfelker's employment was actually terminated on March 21, 2001, one day short of the time set out in the extension agreement.

The plaintiff was terminated prior to the expiration of the twelve (12) month anniversary of his employment. However, under Article 1.05 of the employment agreement, plaintiff is entitled to the $100,000 bonus irrespective of when or under what conditions he was terminated. Article 1.05 of the employment agreement reads as follows:

> 1.05. <u>Bonus</u>. The company agrees to pay a bonus of not less than $20,000.00 per year (the "Bonus") to Executive for the next consecutive 5 fiscal years (May 1 - April 30). The bonus shall be paid to the Executive on or before each July 15 Commencing on July 15, 2001.

The only change that Article 2.04 of the employment agreement makes regarding the bonus is the provision that if the employment is terminated prior to the

expiration of the twelve (12) month term of employment, then, in such event the $100,000 bonus shall be payable within ten (10) days of such termination.

Having determined that the plaintiff is entitled to recover certain benefits under the terms and provisions of the employment agreement, the Court must now determine the benefits to which plaintiff is entitled.

The Court finds that in accordance with the terms and provisions of the employment agreement, the plaintiff is entitled to recover the bonus of $100,000.00. After plaintiff's termination, Identity Group originally carried the $100,000 bonus as an obligation in the company records and memorandums but later omitted the same apparently having changed positions by denying liability for the bonus. The proof at trial indicated that the plaintiff was asking $600,000.00 for the sale of D.L. Technologies and that Identity Group had offered $400,000.00. The parties ultimately agreed to split the difference and place the $100,000.00 bonus in Mr. Frounfelker's employment agreement.

In addition to recovering the $100,000.00 bonus, the Court finds that the plaintiff is entitled to recover the following additional sums from the defendant:

a) $52,885 severance benefits as provided by Article 1.04 of the employment agreement;

b) $2,065 benefits which should have been contributed to plaintiff's 401(k) plan provided by Section 1.04(c) of the employment agreement;

c) $4,808 for his unused ten day vacation;

d) $3,082 for the remaining nine (9) unpaid days of his original one year term.

Even if plaintiff was not terminated prior to the expiration of the twelve (12) month term of employment, he would be entitled to recover all the benefits heretofore enumerated except for the $3,082 nine (9) day salary item.

The Court, thus, finds that the plaintiff is entitled to recover from the defendant the total sum of One Hundred Sixty-Two Thousand Eight Hundred Forty Dollars $162,840.00 together with prejudgment interest from and after the date of the filing of his complaint on May 24, 2001, at the rate of Seven and One-half (7½%) percent per annum. In addition to the foregoing, it having been found that the defendant breached the terms of the employment agreement, in accordance with Article 6.07 of that agreement, the Court finds that the plaintiff is entitled to recover from the defendant his reasonable attorney fees, costs and expenses of litigation.

The searching and penetrating analysis of the Chancellor can hardly be disputed.

The Asset Purchase Agreement, whereby Identity Group, Inc. bought out Frounfelker's company, and the Employment Agreement, whereby Frounfelker was to go to work for Identity Group, Inc., were all part of one single transaction, and one would not have occurred without the other. So testified Art Dilling, Chief Financial Officer of Identity Group, Inc. at the time of the transaction.

THE COURT: All right, you have the right, of course, to use his deposition.

MS. WILSON: Also, Your Honor, Mr. Dilling was the CFO at the time that Mr. Frounfelker became employed at Identity, and Mr. Dilling was instrumental in the negotiations for the purchase of D.L. Technologies, Mr. Frounfelker's corporation.

Page 39, line 1, question: "Yeah, but you're the one that had negotiated the employment contract, weren't you?"

Answer: "Don did."

And for the record, Your Honor, that's Don Polak, the defendant they brought to testify.

Question: "Did you negotiate it at all?"

Answer: "I don't think so. If I had any implication, it was very minor."

Question: "Yeah, but, Mr. Dilling, the hundred thousand dollars ($100,000) was moved out of the purchase to the employment agreement during the negotiations, and you talked about that at the time; isn't that correct?"

Answer: "Yeah, with Don."

Page 40, question: "Before the deck got shuffled, in the negotiations, you had an extra hundred thousand dollars ($100,000) in the purchase price; is that correct?"

Answer: "One of the considerations was a hundred thousand dollars ($100,000) more in the purchase price, yes."

-10-

Continuing in Mr. Dilling's deposition, page 49, line 8, question: "Okay, as I understand it, the only reason you would have not bought his business without being able to hire him would be that you would be concerned he'd find some way to compete in the future against you if he just sold that business and didn't come to work for you; is that correct?"

Answer: "I don't know that David was out there looking to sell his business. If memory serves me correctly, we went to David."

Question: "Why do you think that?"

Answer: "That's what I remember."

Question: "Well, why do you think you went to David?"

Answer: "We had the need for his expertise in a management role."

Page 45, question: "Are you telling us that you didn't think you could hire him unless you bought his business?"

Answer: "Well, it's one of those situations, we wouldn't do either one without doing the other."

Question: "You couldn't do either one without the other; is that right?"

Answer: "That's what it eventually turned out to be, yes."

Question: "But let's look at this. You could have bought his business and not hired him; isn't that fair?"

Answer: "Yeah, we could have, but we didn't want to do that. We really wanted him to come and perform for us."

Question: "Well, wouldn't you have bought his business regardless of whether you could get him to come and work for you?"

Answer: "I think it would be ludicrous for me to assume that no older than David is, and as ambitious as he is, that if we bought his business, he would sit back and do nothing, which is exactly what happened six or seven or eight years earlier when we, in 1994, when we came to Cookeville and we chose not to

keep David with us, he immediately goes into competition with us. A bright guy, he's got all of the stuff, and has got all of the contacts, he's not going to sit still."

Question: "So?"

Answer: "What do you mean so?" Moving to page 46.

Question: "What difference did that make to you?"

Answer: "He's going to go back out and go against us again."

Question: "Well, did you care if he was going against you?"

Answer: "Well, sure."

Question: "Why? You're bigger than he is. He's just a little fish in a big pond."

Answer: "I guess we recognized his talent and abilities and wanted him to come work for us."

Question: "Does that mean you didn't want him under any circumstances competing against you if you could help that?"

Answer: "Well, sure."

Question, line 23: "So, in addition to getting his management abilities, one of your fundamental purposes in these related transactions was to keep him out of the market as a competitor, either in his old business or in a new business; is that fair?"

Answer: "As long as you understand, at the same time, we had a severe need, and this was the perfect time to accomplish several things."

Page 170 of Mr. Dilling's deposition, line 5, question: "Is David a good person?"

Answer: "I've never seen anything to think otherwise."

The terms of separate contracts forming integral parts of a single transaction may be considered together. *See McCall v. Towne Square, Inc.*, 503 S.W.2d 180, 182-83 (Tenn. 1973); *Stovall v. Dattel*, 619 S.W.2d 125, 127 (Tenn. Ct. App. 1981). "In this case, the December 14, 1992 construction contract and all the contracts executed on March 11, 1993 may be construed together

because they are integral ingredients to the development and construction of the Thompson Station project." *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 599 (Tenn.Ct.App. 1999).

> With reliance on textbook authority, the Supreme Court of Tennessee held:

> > Construing contemporaneous instruments together means simply that if there are any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect as between the parties themselves *and all persons charged with notice so that the intent of the parties may be carried out and the whole agreement actually made may be effectuated.*

*McCall*, 503 S.W.2d at 183 (quoting 17 Am. Jur. 2d *Contracts* § 263-65).

One cannot read the provisions of the Asset Purchase Agreement in conjunction with the Employment Agreement and reach any other conclusion but that the entire transaction was to close on March 31, 2000, and David Frounfelker was to go to work for Identity Group, Inc. on April 1, 2000. It is not disputed that Frounfelker did not go on the payroll of Identity Group, Inc. until April 1, 2000. It is not disputed that, under the terms of Article VIII of the Asset Purchase Agreement dated March 15, 2000, Frounfelker was required "from the date hereof until the closing" to continue to carry on the business of D.L. Technologies, Inc. It is not disputed that, in fact, Frounfelker did carry on such business between March 15 and March 31, 2000, and was compensated for that period of time, not by Identity Group, Inc., but by D.L. Technologies, Inc. It is not disputed that, under paragraph 2.08 of the Asset Purchase Agreement, "risk of loss, damage, or destruction to any of the Assets shall be born by Seller through the Closing Date."

The representatives of Identity Group, Inc. actually involved in the contractual arrangements with Frounfelker never construed the contractual arrangements to mean anything except that the contract of employment began April 1, 2000, and expired April 1, 2001. Mr. Art Dilling testified in his deposition:

> Page 173. "And read that statement into the record, please,"

> Answer: "'The next review date remains April 1st, 2001.'"

> Question: "Now, what does that mean?"

> Answer: "We have performance appraisals, and these are generally on a 12 month basis. So that there is no confusion, I spelled it out."

Question: "And the purpose of that was to make sure that an annual review would be done, or was due on the 12-month anniversary of his employment commencing; is that correct?"

Answer: "Yes."

Question: "And you knew at the time when the employment commenced so you could say when the annual review was done; is that correct?"

Answer: "Yes."

Question: "At that time, David Frounfelker was to be president of Porelon, from April 1st, 2000, until April 1st, 2001; is that correct?"

Answer: "I think that was the intent."

Questions: "That was the structure of the whole deal, wasn't it?"

Answer: "Uh-huh (yes)."

Question: "You need to say yes."

Answer: "Yes."

. . . .

Continuing in Mr. Dilling's deposition at page 175, line 3, question: "The agreement, the employment agreement, got signed early in this case on March 15th, when the purchase contract was signed; isn't that correct?"

Answer: "I think that's right."

Question: "But the intent of the parties was understood and clear all along, that the actual employment was to commence on April 1st, 2000, and run in its initial term a full 12 months from when the employment actually started and the work started; is that correct?"

Mr. Cavanaugh has an objection to legal conclusion.

Answer: I guess the confusion is, we didn't know in between March 15 and April 1 when he was going to be available. I guess that was the issue. So, I can't say that on March 15 we knew that April 1 was the issue. It just happened

-14-

to end up being April 1.  It could have been some other date – it could have been some other number short of that.

Page 176., line 9, question: "In any case, the commencement date of Mr. Frounfelker's employment agreement as president of Porelon was to be the first day he started work, as you understood it in your capacity as an officer of Identity Group; isn't that correct?"

Answer, line 16: "With my limited legal understandings, it appeared to me that when you come to work is when everything starts."

Line 19, question: "In this case, that would be April 1st, 2000?"

Answer: "Yes."

Mr. Don Polak was chief executive officer of Identity Group, Inc. at the time of the contractual arrangements with Mr. Frounfelker.  He testified in deposition:

Answer: "I didn't hire Mr. Frounfelker.  I mean, I bought his business in order to get him to come to work for us."

Question: Page 81, line 1, "So you were pretty determined to get Mr. Frounfelker in the position of president of Porelon?"

Answer: "He was my first choice, yeah."

Question: "You didn't really have any other choices at that time, did you?"

Answer: "No, we never looked.  But let me also say, though, that we didn't have a president of Porelon prior to this.  This was a created position."

Page 62 of Mr. Polak's deposition, line 4, question: "So, it was a packaged deal, meaning whatever you purchased D.L. Technologies for beared a relationship to whatever you paid in salary to David Frounfelker?"

Answer: "Yes."

        . . . .

MS. WILSON: Continuing with Mr. Polak's deposition on page 132, line 22, question: "During the time that Mr. Frounfelker was employed in

-15-

the position of president of Porelon, did you feel that he was using his best efforts, energies and abilities in the performance of his duties for Porelon?"

Page 133, answer: "Yes."

Page 130 in Mr. Polak's deposition, line 18, question: "Well, did he meet your expectations in what you had wanted him to do, and where you wanted him to?"

Answer: "I think generally that is true."

Question: "Would you describe him as a good employee?"

Answer: "Yes, I think so. Understand that he was there a realtively short time, so that it was hard to make a definitive conclusion about some things, evaluation."

Continuing with Mr. Polak's deposition, Your Honor, page 127, line 7, question: "Now, in negotiating the employment contract, which you did with David Frounfelker; isn't that correct?"

Answer: "True."

Page 125, line 10, question: "And his position as president of Porelon, assuming that position after the close of Identity's purchase of D.L. Technologies; is that correct?"

Answer: "Yes."

Line 14, question: "So, if the closing date of Identity's purchase of D.L. Technologies was March 31, 2000, Mr. Frounfelker's first day of work would have been April 1, 2000, or sometime thereafter?"

Answer: "I think that – I mean, that would have been a logical assumption. I think it was written a little bit differently, but I think it – yeah."

Page 126, line 5. "I was hiring David Frounfelker, period, and hopefully he would stay a lot longer than 12 months."

The intention of the parties gleaned from all the testimony of persons who were involved in negotiating, executing and consummating the contractual arrangements between the parties is clear and all but undisputed. It was not until the arrival of Rand Krikorian at Identity Group, Inc. in September of 2000, six months after the consummation of the contract, that any doubt was cast upon

the meaning of the contracts.  Mr. Krikorian, having arrived on the scene long after the contract had been made between the parties, put on blinders and, with myopic vision, zeroed in on the first page of the Employment Agreement without regard to anything else.

Q.      Now, Mr. Krikorian, you were not around when the Employment Agreement was formulated and executed; is that correct?

A.      That is correct.

Q.      And certainly the parties' intentions, that being Identity and Mr. Frounfelker, what they were at the time that the Employment Agreement was executed and formed, you're unaware of that; is that correct?

A.      That's why I asked David his interpretation of the contract when I met with him, yes.

Q.      And the reason you asked Mr. Frounfelker the interpretation of his contract was because you found the contract to be a little ambiguous yourself; is that true?

A.      No, not at all.  The contract was clearly stating a March 15th date.  My confusion was the fact that with five or six days to go, David hadn't raised the issue with me.  As I just stated, I had no knowledge that his actual payroll date was April 1st.  So there was no ambiguity in my mind at all.  He was guaranteed employment to the anniversary of the commencement date, which was March 15th.

Q.      But you did in fact consult with legal counsel prior to March 15th, did you not, regarding the interpretation of the contract, meaning the actual day of when the commencement date was versus his employment?

A.      No.  No.  We did not consult as to the commencement date.  What I was consulting with them on were my options under the contract.  They had drafted the contract.  I wanted to make sure how I was interpreting my options under the contract as being clear.

It is long settled in Tennessee and elsewhere that a party to a contract cannot isolate a single provision of a contract and compel a favorable construction thereof without regard to other provisions of the contract.

The rules and principles laid down for the exposition of contracts have for their sole object "to do justice between the parties, by enforcing a performance of their agreement according to the sense in which they mutually understood it at the time it was made."  Chitty on Con. 73.  The intention is the governing principle of

construction. In ascertaining the intention, the situation of the parties, the motives that led to the agreement, and the objects designed to be effected by it may all be looked to by the court. Id. 74, note 2.

The construction must be upon the entire instrument, so that one part may help to expound the other. And in the construction of a deed or other instrument the *recitals* may be looked to and used to explain a doubt as to the meaning and intention of the parties. 1 Spence's Eq. Jur. 528, 535. "If, by a particular construction, the stipulation of the party would be frivolous and utterly ineffectual, and the apparent object of the contract in reference to its subject-matter would be frustrated, but a contrary exposition, though, *per se*, the less appropriate, looking to words only, would produce a different effect, the latter interpretation shall be applied to the agreement, if it can possibly be supported by anything in the contract, or the nature thereof." Chitty on Con. 80.

No particular form of words is necessary to make a covenant, but any words which manifest the intention of the parties in respect to the subject-matter of the contract are sufficient. Bac. Abr., Covenant, A; Com. Dig., Covenant, A; 2 Lebr. N. P. 469; 3 Johns. 44.

Applying these principles to the case under consideration, the conclusion is inevitable that the instrument declared on, in its legal effect, is a covenant to indemnify the defendants in error against a personal liability, or, in other words, to prevent their suffering loss or damage in consequence of having become the makers of the several notes specified in said instrument. Looking to the situation of the parties at the time of the agreement, the motives which prompted it, and the end to be effected by it, no other sensible meaning can be given to it.

*McNairy v. Thompson*, 33 Tenn. (1 Sneed) 141, 149-150 (1853).

One hundred and forty-six years later, the Supreme Court of Tennessee said:

No single clause in a contract is to be viewed in isolation; rather, the contract is to be 'viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another.' *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985).

*Frizzell Constr. Co. v. Gatlinburg, LLC*, 9 S.W.3d 79, 85 (Tenn. 1999).

When one takes off the blinders in this case and construes the Employment Agreement in conjunction with the Asset Purchase Agreement, the "intent" asserted by Identity Group makes little sense. During the 15-day period between March 15, 2000, and April 1, 2000, Frounfelker is duty bound by the Asset Purchase Agreement to continue to operate the business of D.L. Technologies,

Inc. until after the closing on March 31, 2000. During this same period, he is also the unpaid president of Porelon Division of Identity Group but has no duties to perform. For some inexplicable reason, he has agreed to go to work for one year at $125,000 per year but is, in fact, only to be paid for 50 weeks. Nothing more tellingly refutes the contract construction asserted by Identity Group than the resulting 15 days of gratuitous employment under a yearly contract for $125,000, which is in reality only $119,791.67.

The contract between the parties is clear and unambiguous only if you look alone to the first page of the Employment Agreement. When one looks, however, at all the contractual arrangements, the date on the first page of the Employment Agreement is incompatible with the Asset Purchase Agreement, and cursory consideration of the record in this case establishes that the true intent of the parties was that the employment of Frounfelker was to begin the day after the March 31st closing under the Asset Purchase Agreement. "Although a contract cannot be varied by oral evidence, the course of previous dealings, the circumstances in which the contract was made, and the situation of the parties are matters properly to be looked to by the court in arriving at the intention of the parties to the contract." *Frank Rudy Heirs Assocs. v. Sholodge, Inc.*, 967 S.W.2d 810, 814 (Tenn.Ct.App. 1997).

The trial court held: "In addition to the oral testimony, the documentary evidence introduced at trial indicate that the parties intended for plaintiff's contract of employment to commence on April 1, 2000." The overwhelming weight of the evidence supports this finding by the trial court. Once the term of the contract is thus established, the remainder of the findings of the trial court follow in logical sequence. While in our view, reformation of the contract in this case is not essential to the outcome, we concur with the trial judge that clear and convincing evidence establishes a mutual mistake as to the March 15, 2000, commencement date under the Employment Agreement.

On September 26, 2003, the trial judge entered judgment in the amount of $162,840 in favor of Frounfelker plus prejudgment interest in the amount of 7½%. Thereafter, on October 14, 2003, the trial court entered an additional judgment for attorneys' fees in the amount of $62,748 together with expenses in the amount of $3,864.86. Appellant, Identity Group, raises no issue on appeal as to damages. Such issues are deemed to have been waived. Tenn. R. App. P. 13(b); *See also Blair v. Badenhope*, 940 S.W.2d 575, 576-77 (Tenn.Ct.App. 1996). However, from a consideration of the record, it would appear that the damages found by the trial court are clearly supported by the record and subject to little dispute. Such damages follow almost as a matter of course once the issue of the term of the contract is resolved.

The judgment of the trial court is in all respects affirmed, and the case is remanded to the trial court for such further proceedings as may be necessary.

Costs of appeal are assessed against Appellant.

_____
WILLIAM B.CAIN, JUDGE